**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Arthur Davis and James Moses  et al** ) | |
| **and all others similarly situated** ) | |
| **PLAINTIFFS,** ) | **CASE NO: 06 1002 (JGP)** |
| ) | |
| **DAVID M. WALKER** ) | |
| **Comptroller General of the** ) | |
| **United States c/o United States General** ) | |
| **Accountability Office (GAO)** ) | |
| **and** ) | |
| **Michael Doheny, Chair** ) | |
| **United States Government Accountability Office** ) | |
| **Personnel Appeals Board (PAB)** ) | |
| **DEFENDANTS.** ) | |
| ) | |

**AFFIDAVIT OF VENKAREDDY CHENNAREDDY**

After first being duly sworn in accordance with law, I make this affidavit, as given

below, under the penalties of perjury.


**I.  PERSONAL INFORMATION, ACADEMIC QUALIFICATIONS, WORK AND**
**PROFESSIONAL WRITING EXPERIENCE**

**A.  Personal Information**

My name is Venkareddy Chennareddy. I am in the age protected group, 40 years and

older. I am an Asian American male.  I was hired by GAO on August 14, 1978.  My federal

government service date was May 1, 1976, which meant my services in the other federal

government agencies were included in my total service in U.S. federal government.  My highest

position in GAO was Senior Economist-Band-II in the Applied Research Methods (ARM) in the

U.S. Government Accountability Office (GAO) at Washington, D.C.   I am currently residing at

8830 Bloomsbury CT, Colorado Springs, CO. 80920.  My telephone number is (719) 598-2051.

1

My fax number is (719) 598-2051.  My E.Mail address is Chennareddy1934@Yahoo.com.

### B.  Academic Qualifications

  I have M.A. Economics (High Second Class) from Andhra University, M.Sc. Statistics (First Class and First rank) from Andhra University, and a PhD with completed  comprehensive examinations in Economic  theory (administered  by  the Department of Economics), Mathematical Statistics (administered by the Department of Statistics), and Agricultural economics—general, production, and price analysis—administered by the Department of Agricultural Economics, from  Michigan State University, East Lansing, Michigan, U.S.A.

### C.  Professional Writing Experience

I have more than 135 publications and professional write-ups to my credit which include staff papers and  staff reports in Andhra University, Michigan State University (PhD thesis), Tennessee Valley Authority, Southern Research Institute, the Budget Division of the Conservation and Stabilization Service of the U.S. Department of Agriculture, GAO, and the District of  Columbia Government, presentations at the domestic (U.S.A) and international conferences related to economics,  business, and public administration areas, publications in the conference proceedings issues, publications in the journals, chapters in books, and contributions to  GAO reports.

### D.  Awards

I obtained 4 conference best research paper awards decided by committees after reviews, 1 in November, 1996 from the Association For Global Business, 1 in January 2006 from the International Academy For Business and Public Administration Disciplines, and 2 in April 2006

from the International Academy For Business and Public Administration Disciplines. These

papers were peer-reviewed second-time by professors and published in the international business

and economics journals.  Also, I obtained some GAO awards: 1. Certificate of Merit with cash

award 2. Certificate of Appreciation with cash award 3. Spot award for numerical accuracy in

the office of Chief Economist  4.  Salary bonus awards in the distant past in GAO, when they

were in existence. 5. I obtained and held Graduate Research Assistantship for a 4-year period at

Michigan State University, East Lansing, Michigan, U.S.A.

### E. Experience outside GAO

I have extensive teaching and research experience in various teaching and research

institutions.  I have about 10 years of teaching experience in the United States in

colleges—Talladega college— and Universities—Saginaw Valley State University in Michigan

and University of Wisconsin at Platteville. I was promoted to Senior Research Officer from

Research Officer in a 4-year research project in the Department of Economics, Andhra

University, from Assistant Professor of Economics to Associate Professor of Economics in the

Department of Economics, College of Business and Economics, University of Wisconsin at

Platteville, from a Research Economist to Senior Economist at Southern Research Institute,

Birmingham, Alabama. I was detailed as a consultant by GAO to the Government of the District

of Columbia for about 8 months.   I worked as a Faculty Fellow during three summers; two

summers in the Budget Division of the Conservation and Stabilization Service of the U.S.

Department of Agriculture and one summer at the Economic Research Service of the U.S.

Department of Agriculture.

3

**F. Other Professional Activities**

I presented a number of papers, chaired a number of sessions, discussed a number of

others' papers in various professional economics and business and public administration

conferences, and reviewed some papers for academic associations for their decisions regarding

the submissions for conference presentations and for publication in journals.

**G.  Reference Letter from a GAO Past Supervisor**

One of my supervisors in GAO gave me a reference letter on September 18, 1985

after his retirement, which was addressed to "To whom it may concern" and wrote

"Dr. Venkareddy Chennareddy was assigned to work on several projects for
which I was Project Director at the U.S. General Accounting Office from mid
1979 to mid 1983.  Dr. Chennareddy served as a senior analyst and he developed
several econometric models for measuring the impact of important federal
programs. He was… [conscientious] …and technically extremely well qualified
not only in the field of economics but also statistics and operations research.
Some of the projects for which he provided very valuable analyses were:
     The impact of farm parity programs on food prices.
     The impact of trucking deregulation on unemployment among truckers.
     The efficiency of the department of Energy's uranium enrichment
     program.
     An evaluation of the Federal Emergency Management Agency's criteria
     for awarding disaster assistance
     The impact of the energy crisis on attendance at National Parks.
He made a real contribution to these projects."

**H.  Letter From the Comptroller General, GAO**

Honorable David M. Walker, Comptroller General, GAO, wrote to me

"I am pleased to take this opportunity to thank you for your
contributions to the work of the Government Accountability Office
and for your dedicated service to the American public…. I want to
commend you for the excellent application of your technical
expertise, your willingness to work long hours when required, and
the attention to detail you have applied to so much work which has

helped to assure consistency with GAO's quality standards.  These characteristics were especially noted in work on: regulatory reform;…. As the primary referencer…, your familiarity with technical evaluation issues facilitated the reviews and contributed thoughtful suggestions, particularly in reports on…..as treatments."

## I.        Expertise in Statistical Analysis

Therefore, I believe that, on the basis of my academic qualifications and professional writing experience in advanced statistical analyses in various fields, I would qualify as a statistical expert in analyzing data related to employment discrimination cases and in offering expert opinions based on statistical evidence embedded in the data.

## II.  REPRISAL IN TERMS OF UNFAIR EVALUATIONS, SUPPRESSION OF SALARY INCREASES, AND CAMOUFLAGED FORCIBLE RETIREMENT

Because of my prior ADEA complaints and my involvement in the Age Class action in the federal district court (discussed in later sections), GAO management wanted to stop my annual merit salary increases and salary adjustments for cost of living increases and to humiliate and frustrate me and to force me to retire as an instrument of retaliation (or reprisal) against me. To achieve retaliation (or reprisal) in way of damaging my career in GAO, and downgrading classification of my Band II position into Band II-A, GAO management suppressed my ratings for 3 years in a row. My ratings were suppressed by my supervisor by writing narrative **illusory facts** to support the management to retaliate against me, because of my involvement in prior ADEA cases against GAO.  I replied and provided **facts** in my rebuttal, submitted to the Office of Opportunity and Inclusiveness, GAO.  These facts were simply disregarded in the GAO decision in order to support GAO management. Moreover, GAO took more than 3 years to issue its decision. I officially submitted a complaint about age biased discrimination in promotion (3-

year supervisory ratings were not required, as stipulated in the promotion announcements, ARM-04-01 and ARM-04-02) on March 15, 2004. Despite the fact that I submitted my complaints more than 2 years ago, GAO did not issues its decision in reference to this complaint related to promotion selection

By relating to my ratings, my annual merit salary increases and adjustments for cost of living increases were suppressed for three fiscal years from 2003.  Based on my past experience in GAO, I was afraid that my band II might be classified as II-A instead of II-B (II-A is lower than II, which is lower than II-B).  The effect of this, had I allowed it to happen, was the creation of depressing and humiliating situation and damaging my career in GAO.  Thus, my "retirement" was actually a camouflaged forced retirement, which culminated effective January 4, 2006.  GAO, expecting my complaint in the court, if my band II was downgraded to Band II-A, decided, contrary to its rules, to continue my classification as  Band II instead of Band II-B or Band II-A.  This was a serious violation of GAO rules.  The Band II split decisions were made several weeks before my retirement, which was effective January 4, 2006.  Because GAO had not timely responded to my previous complaint, I felt it was imperative to my professional standing and reputation to retire before any further downgrades and damage to my status occurred.  The result was my forced retirement.

### III.  ANNECDOTAL GAO MANAGEMENT DISCRIMINATORY ATTITUDES AND DELIBERATE OPERATIONAL MANIPULATIONS FOR ACHIEVING THEIR OBJECTIVES
#### A.  Gaming the System in GAO

"Gaming the promotion system" in GAO has been a camouflaged violation of ADEA for more than 20 years.  This conclusion is supported by GAO memorandum dated October 31,

1984. This practice, which resulted in observed bias against older employees, was admitted in GAO internal documents (see footnote 1).1

**B. Purposeful Dissuasion of Well-Qualified and Experienced Older Staff Members**

In GAO, not only "gaming" was a problem, but also purposefully dissuading well-qualified and experienced older staff members, who were competing with the favored and pre-selected younger staff members, not to apply for promotion announcements, was and is a serious problem in GAO.

One good example was my own case. My supervisor purposefully dissuaded me not to apply for a promotion announcement number IPE-82-1031(I), GS-14 position, because I was competing with a young staff member , who was 36 years old, and far younger than me and far less qualified than me, whom my supervisor wanted to promote. I did not apply for that position because of fear of later reprisal from my supervisor, if I did apply by disregarding his strong deterring. In fact, I found out later that the selectee was the only applicant for that position. That is how, that particular prejudiced supervisor achieved his own personnel quota at GAO.

Another example of prejudice shown by a supervisor against me was constantly mistreating me in way of abusing, humiliating, and harassing me to make me not to suggest good analytical work so that I would not have the opportunity to be rewarded by promotion. In fact, he was demanding me not to apply for a promotion to GS-14 to be announced later by stating that "We want to promote "Pat Doerning ". We do not want you to compete with him." The pre-

---

1 This was clearly supported by a within-GAO-memorandum to the comptroller General from the Assistant comptroller General for operations, Assistant comptroller General for Human resources, and the Chairman of the GS-13/14 Management and Policy Advisory Council, dated October 31, 1984, in which it was stated that "Some staff openly admit that they are "gaming" the system."

7

selected young man, less than 40 years old and far younger than me had only Master degree in economics.    This is another kind of deterring potential applications from well-qualified professional older staff members.    One of my supervisors made a statement "We [management] are better off with high school graduates" implying that persons, like me, who were actually "well-qualified" for GAO type work, especially professional audit work, should be downgraded in favor of persons, who could be subject to manipulation more easily to achieve their personnel management objectives, varying from one supervisor to another supervisor.    The management consistently promoted far younger persons, favored and pre-selected by management, because of traditional age stereotype prejudice foisted upon each supervisor by top GAO management (see footnote 2).2

### C. Destruction of Information to obstruct Complaint Processing

In my age discrimination complaint processing in FY1985, I found that, GAO destroyed application package of one of the selected promoted against me to suppress my claim (see footnote 3).3   A memorandum from Ms. Stephen P. May, Program Analyst-HRD, to JOA File 85-6 indicated that copies of the paperwork submitted by the applicants for promotion announcement number 85-6, a vacancy for GS-1515-14 Operations Research Analyst in 1984, were not found.  This was clearly a serious violation of GAO rule for obstructing discrimination complaint processing and violate federal retention "principles" contained in federal regulation applicable to all federal agencies.

---

2
 Again, see quotes contained in SES Contracts and CG "expectations memoranda" discovered in related cases.  Over the years of discovery in my putative class action case numerous examples (hundreds) of "guidelines" were conveyed to SES supervisors and "managing directors" using GAO's centralized SES contract and feedback system.

3 –GAO rule indicates that all the applications and paperwork related to promotion selections should be kept  for  3 years to enable complaint processing

### D. Facially Neutral but Camouflaged Merit Promotion System

I have not applied for many promotion opportunities for which I was well qualified because of a serious problem of GAO's management "gaming" the promotion system. When rejected, which in a foregone conclusion for older experienced employees, the resultant humiliation and frustration destroys employee morale and harms GAO's mission.  Good professional level well qualified, analytical, and highly experienced audit type analysts, who work for the U.S. Congress (House and Senate), gain value, as they gain experience, not the opposite as is management erroneous perception and policy.  This kind of age discrimination is therefore highly destructive to the overall value of GAO and its mission.

Age discrimination is camouflaged in "gaming the merit promotion system" by deliberate assignment of inferior work tasks, intentional lowering of performance evaluations, failing to place older professionals in the Best Qualified List, ignoring the difficulty of prior work assignments, and gerrymandering performance evaluations.  These prohibited practices were rampant and have been continuing without check of any kind.

The CSP (Competitive Selection Plan) and MSP (Merit Selection Plan) since 1982 appeared to be facially neutral but have been the instruments of disguised highly subjective discriminatory promotion systems against older, experienced, and well-qualified professional staff members.  The underlying purpose was and is to promote those persons the management wanted to promote mostly younger professional staff members, mainly always less than 40 years old.  This harmful and evil intentional age discrimination has been on-going, in my personal observation, in the U.S. GAO since 1982.  This has been evident from various examples of

anecdotal information about the operations in GAO and the discriminatory attitudes of GAO, exhibited in the case of minority staff members, which are discussed in the later sections.

### E.  Camouflaged Age Discrimination by Selecting Officials.

I was given high performance ratings (exceptional) for objective dimensions.  However, despite these consistent best  ratings, and my qualifications and experience inside and outside GAO , which were consistently far higher than the selectees,  my selection to the Best Qualified List for various promotions was denied many times. I was cut off from the Best Qualified List by the panel members, appointed by the selecting officials, on the basis of highly subjective discriminatory judgmental decisions, using a camouflaged discriminatory system—relative ranking system—designed by GAO management to promote those favored and pre-selected persons far younger than me, most often less than 40 years old. The panel members, using the discriminatory **Relative Ranking Method**, inflated the supervisory ratings of younger persons and deflated my supervisory ratings.  This GAO unfair procedure further widened the already biased difference between already distorted supervisory ratings of younger persons and of those older persons. This procedure of "**Relative Ranking Method**" of applications for making the Best Qualified List for promotion was and is not an objective method. The selections for these were not based on any variety of job-related factors such as quantity and quality of total relevant experience necessary for potential successful performance at a higher level position. Rather, the procedure was age based and intentionally detrimental to the promotion selection of older persons. The rating system had been designed and used by GAO to discriminate against well qualified and competent older staff members in GAO. I became a victim of such a facially neutral but discriminatory highly subjective promotion selection procedure against older employees for nearly the entire term of my twenty five years of at GAO.

10

### F. Selecting Officials' Self-Serving Standards and Procedures
For Achieving Their Objectives

In 1986, I found that the selectee for a Mathematical Statistician- GS-14 position with an announcement NSIAD-87-3 had **only** four "fully successful" ratings", three "No Basis" ratings, and one "superior" rating in the year of promotion (1986), **far lower than my own ratings**. The selectee was less than 40 years old in 1986 (probably 39 years old) at the time of selection for this position.

Even though I was well-qualified and better qualified than the selectee for this position and had better ratings than those of the selectee, I did not apply for this position. This was because of age discrimination of me in the prior promotion selections since 1982, which caused frustration and disheartenment, and **chilling effect** on my interest in my applying for a promotion. Because of this reason, I thought it was **a futile exercise** for me to apply for this position in 1986.

In another situation, in 2003, GAO did not require supervisory ratings for the promotion announcements ARM-04-02-Assistant Director-Social science -101-III and ARM-04-1-Assistant Director-Economics-110-III. I applied for these two positions but was not selected. Requirement of supervisory ratings was not stipulated in the promotion announcement.

### G. GAO Comptroller General's Statements—Subjective Panel Process, Irregularities
In Rating

In the Comptroller General's memorandum to the Heads and Divisions and offices, dated March 10, 1989, p.2 and GAO Management News of March 13-17, 1989, p.4, Mr. Bowsher, Comptroller General, GAO, stated " the panel process has not worked as objectively as we had hoped." The Management news and the memorandum noted "irregularities in rating and panel processes, deficiencies in feedback and guidance, and failure to provide minorities with good developmental experiences on an equal basis with non-minorities" were observed. Mr. Bowsher

11

also stated "Too many GAO minorities do not have confidence that they are treated fairly" and "the organization pays a high cost in morale, lowered productivity, and interracial tension when unfair or discriminatory attitudes are tolerated."  Because of the unfair and discriminatory operational environment in GAO, I represented all others, similarly situated as me, and filed an Age Class Action suite in the Federal District Court in the District of Columbia.   As an alternative to the existing merit selection plan in operation in GAO, I proposed a non-discriminatory objective merit selection plan for promotions in GAO.  This could be considered as a suggestion and GAO could hire consultants to modify this, if necessary, for achieving a non-discriminatory objective merit selection plan for promotions in GAO.  My preliminary proposal was based on the comments of the Comptroller General, Mr. Bowsher, and two court cases: Patterson v. general Motors Corp., 631 F.2d 476 (7th Cir. 1980, cert. denied, 451 U.S. 914 (1981) and Eastland v. Tennessee valley Authority, 704 F2.d 613 (11th Cir. 1983). My proposal was purely merit-based but non-discriminatory and according to this plan an exceptionally meritorious staff member could get promotion irrespective of seniority, race, age, religion, national origin, obesity, disability and any other factor.  I submitted this plan proposal to Ms. Mary Hamilton, Director for Quality Management, GAO Quality Council, on July 17, 1991.  Ms. Mary Hamilton sent this proposal to the GAO Quality Council Members and sent copies to observers, QM Staff, and to me (Chennareddy) on July 31, 1991.  In that memorandum, she wrote "the proposals do contain ideas that we should consider, if we decide to select one of these processes for analysis.  Therefore, I am passing the paper on to you for your information.  And I am suggesting that we ask the Key Processes Work group to add these processes—merit selection for promotion and lateral transfers—to their list of processes that are candidates for GAO-wide analysis."  A copy of my proposal will be submitted to the court at the time of hearing as a non-discriminatory merit selection plan for promotions in GAO, as a suggestion from the plaintiffs.

12

### H.  GAO's Racial Discriminatory Attitude Might Reflect Age Discrimination Also

In my age and race discrimination complaint processing, the following data supplied by GAO related to racial minorities indicate discriminatory attitude, which may also reflect discriminatory attitude on the basis of age. There were 86 applications out of which 72 applications belong to non-minority members and 14 applications belong to minority members (see footnote 4).4 But 16 promotions were given to non-minority members and 0 promotions were given to minority members.  This inexorable 0 promotion rate for minority Evaluators with Special Factors/Evaluator-Related specialist staff members—promotions to GS-14, GAO-Wide—reflects discriminatory attitude beyond doubt against minority members.  The "inexorable zero"  standard referred to in International brotherhood of Teamsters v. United States Postal Service, 431 U.S. 324, 342 n.23, 14 FEP Cases 1514 (1977); Valentino v. United states postal Service, 674 F.2d 56, 73,28 FEP Cases 593 (D.C.  Cir. 1982) D, and Hogan v. pierce, 31 FEP Cases 115 (D.C. D. Ct. 1983) is applicable in this case. The Circuit in Valentino v. United States Postal Service stated "the "inexorable zero" can raise an inference of discrimination even if the subgroup analyzed is relatively small." Yet in this case and GAO Civil Rights Office argued that this database of applications, officially provided by GAO to the plaintiff, has more applications from the minority members than the minority individuals, who applied for 16 promotion announcements. The officials in these offices argued only one way, not mentioning more applications from non-minority members than the non-minority individuals, who applied for 16 promotion announcements. Therefore, these officials argued that this database of applications could not be used for drawing statistical inference of racial discrimination in GAO. The argument of these officials against duplicate applications was incorrect because, if there 16 promotion announcements, any qualified staff member had a right to apply for all the 16 promotion announcements, according to GAO rules, although that staff

---

4 Mr. Burt Harris revised these numbers in a PAB hearing.  The original total number of applications provided by the Civil Rights Office, GAO, was  84 and the  original number of non-minority applications was 71, and the original  minority applications was 13.  Mr. Burt Harris added one minority application and one non-minority application and therefore, the total was 86.

member had to obtain only 1 promotion, even if he/she was selected for all the 16 promotion announcements. Thus, the GAO's argument in the Age Class Action, currently pending in the court, that the plaintiffs in the Age Class Action should consider only the application database but not the relevant workforce was flawed and inconsistent with their own argument in an earlier racial discrimination case, as given here.  Moreover, Valentino v. United states postal Service, 674 F.2d 56, 73, 28 FEP Cases 593 (D.C.  Cir. 1982)D, and Hogan v. pierce, 31 FEP Cases 115 (D.C. D. Ct. 1983), Davis v. Califano  613 F2.d 957 (D.C. Circuit. 1979) considered only qualified potential pool of applicants and not the actual number of applications for assessing statistical inference in discrimination in employment. Moreover, the sample in this case (86) is a large sample because a sample with a size greater than or equal to 30 is considered as a large sample. If it is less than 30 (small sample) then "T" distribution is used for testing a hypothesis and for a sample size greater than or equal to 30 (large sample) then a Normal distribution is used. The probability tables for "T" distribution contain only up to 29 degrees of freedom and then the degrees of freedom is given as infinity.  In this case, 86 is a large sample (see Ronald E. Walpole, Introduction To Statistics,  New York, Macmillan Company, 1968, pp. 157-158 and table A.5, p. 333; Freund, John E, Mathematical Statistics, Englewood Cliffs, N.J.: Prentice-Hall, Inc., 1962, table IV, p. 367).  The following section provides a good example for an indication of a flaw in statistical inference based on promotion application database.

### I. GAO's Practice of Racial discrimination Might Reflect GAO's Practice of Age Discrimination Also—Irregularities In Rating and Panel Processes

The GAO Management News dated July 31, 1985 indicated the settlement of two Class Action cases of Black employees in GAO.  In the Management News, March 13-17, 1989, it was stated that Honorable Charles Bowsher, Comptroller General, ordered a number of promotions and investigations into other cases where disciplinary actions might be warranted after EPRP found irregularities in rating and Panel processes. Also in the memorandum to Heads of divisions and Offices by the Comptroller General, dated March 10, 1989, Honorable Charles

14

Bowsher, Comptroller General, stated "The EPRP reports have brought to light instances where the panel process has not worked as objectively as we had hoped." A memorandum to Comptroller General from Assistant Comptroller General for Operations, Assistant Comptroller General for Human resources, and the Chairman of the GS-13/14 Management Study Group (Lamar White) dated October 31, 1984 indicated the "gaming the system" in GAO.

In the EEOC examiner's report in Fogle's Black Class Action complaint, the Hearing Officer wrote that promotions at above GS-13 level were based on **"largely uncontrolled subjective judgments."** This statement was also quoted by Ms. Karlyn Barker, Washington Post staff writer, in an article entitled "GAO Bias Suit Is Settled; 300 Black Employees to Get $3.5 Million, in Washington Post dated July 31, 1985, Wednesday Final Edition. The same article wrote that the U.S. General Accounting Office announced "yesterday" that it has agreed to pay a total of $3.5 million to about 300 present and former black employees who successfully charged the congressional watchdog agency with racial discrimination in promotions. Also, it was stated that GAO agreed to pay $4.2 million to about 600 blacks who charged that they had been kept in low level GS-2 and GS-3 grades for years and never promoted into the agency's professional ranks. This statement appeared in the same article by the same author in the same issue of the Washington POST as stated above.

It was written in the GAO Management News, Dated July 31, 1985 that settlement was reached in Fogle/Mason Class Actions and that "GAO last fall accepted the recommended findings of an EEOC complaints examiner in the Fogle case, which alleged discrimination in the system used to promote evaluators to the GS-13/14/15 levels from 1976 to 1982 (see Management News, October 23 and 30, 1984). The settlement also includes the Mason class action case, which involves GAO's current process to promote GS-13/14/15 evaluators and evaluator-related specialists." as appeared in the GAO Management News, dated July 31, 1985.

### IV. STATISTICAL INFERENCE OF AGE DISCRIMINATION IN GAO

#### A. Introduction To Attachment C

My academic qualifications in statistics and experience as a statistician in various issue areas would qualify me to do statistical analysis and draw statistical inference related to discrimination in employment inside GAO. The attachment C provides detailed statistical analysis and support for statistical inference of age discrimination in employment in GAO based on data provided to the plaintiffs by GAO in the past and evidence of age discrimination in GAO, as found in the report of the Personnel Appeals Board. For more details see **Attachment C.**

#### B. Conclusion related To Age Discrimination

Based on my experience in GAO for the last 24 years and statistical evidence as shown in the data period 1984-1992, I strongly believe that the data for 1993-2005 and data related to Band II split to Band II-A, if provided by GAO, will lead to my conclusion that GAO's age discrimination, a violation of ADEA in GAO, was certain with almost 100-percent confidence or the probability of finding GAO's age related non-discrimination was practically zero. My conclusion will become 100 percent certain, when GAO will provide authentic data related to workforce and number of promotion selections to the plaintiffs for the period 1984-2005 and the related data in reference to Band II-A split decisions.

16

I hereby incorporate by this reference all of the attachments A-C to this affidavit

**ATTACHMENT A**

**DETAILED HISTORY OF MY EMPLOYMENT IN GAO**

I joined the U.S. government Accountability Office on August 14, 1978.  Since 1982, I applied for many GAO Evaluator (or analyst) and Evaluator-related (or analyst-related) specialist positions at GS-14 and Band III.  Although I was placed into the best Qualified List for many promotion announcements without appointed panels, I was not selected but less qualified from all aspects combined, and far younger than me (less than 40 years old in some cases), were selected for promotions  against me. Some promotion announcements, for which I applied for, were: IPE-82-1122(I) (2 positions), IPE-82-1151 (2 positions), IPE-82-1031(I) (I was dissuaded and deterred from applying by my supervisor, and a B.S (or B.A) degree holder, only one applicant, was selected), IPE-83-1018(I), HRD 85-6, RCED-85-5 (Economist), RCED-85-4 (Operations Research Analyst),   PEMD-87-2 (my ratings were suppressed intentionally to make sure that I could  not  compete with the pre-selected selectee), RCED-89-9. OCE-99-1, RCED-99-3, GGD-99-3, ARM-01-3 (2 positions), ARM-02-2 (3 positions), ARM-02-1, ARM-04-01 and ARM-04-02.

In FY1982, I applied for **four** GS-14 positions in GAO and my application was placed in the Best Qualified List (without panels) for all these positions but was not selected. An applicant with only B.S degree in Economics was promoted against me for one of these positions.  I believe that I was the best qualified applicant from all aspects combined for that position. In

17

1983, I applied for 83-1018(I), a GS-14 position, but was not selected.  A far younger person than me and less than 40 years old was selected.  In 1984 (FY1985), I applied for **five** GS-14 positions in GAO and I was placed in the Best Qualified List for all these positions. But I was not selected for promotion to any one of these positions. I strongly believe that I was the best qualified from all aspects combined for all these **5** positions.  Specifically speaking, two of them, one with B.S in economics and another with M.S in economics, were selected against me for promotion to GS-14 positions.

    Both of them were far younger than me and were less than 40 years old.  When I asked Mr. Dexter Peach, selecting official, who selected Mr. Pat Doerning, informally in an office party why I was not selected for a GS-14 position (for which Mr. Pat Doerning was selected), he replied that he was sorry for my non-selection and he selected on the basis of seniority but not on the basis of qualifications and merit. This selection relates to the announcement RCED-85-4. Mr. Pat Doerning and me both had more than 4.25 years of service in a lower grade (GS-13) and my average ratings in a 2-year period was as good as that for him (both  4.0) but I had a PhD in economics with a variety of experience inside and outside GAO and professional writing experience in varied issue areas, while Mr. Pat Doerning  had only M.A in economics and I was doing advanced analytical work due to the fact that I had a Ph. degree in economics.  Moreover, the 2-year average ratings for me and Mr. Pat Doerning were from two different supervisors and my supervisor had a Master degree and Mr. Pat Doerning's supervisor had only B.A (or B.S) degree. Moreover, I had more than 58 professional writings while as Mr. Pat Doerning had only 2.

    For a GS-14 Economist position (RCED-85-5), a staff member (Mr. Mitchell Rachlis),

far younger than me and less than 40 years old, with border line rating for "working relationship" in one of the 2 years, was promoted against me. His 2-year average ratings  was 3.6, while mine was 4.0. We both have more than 4.25 years of service in a lower grade (GS-13). Although we both had Ph.D degrees, I had varied qualifications and experience inside and outside GAO, relevant to the job requirements for technical assistance positions as well as to the reports that GAO was charged with preparing reports compared to those of the selectee. Moreover, I had more than 58 professional writings, while as Mr. Mitchell Rachlis had only 5.

For a GS-14 Operations Research Analyst position (HRD-85-6), a staff member (Mr. Bill Isrin), far younger than me and less than 40 years old, with only B.S degree in economics, with less than 3.25 years of service in a lower grade (GS-13), with no publications, was selected. I had  MA, MSc. Ph.D, more than 58 professional writings, more than 4.25 years of service in a lower garde (GS-13). We both had 4.0 average ratings for 2 years.

In the case of one of the other two selectees (announcement PEMD-85-3), the application package had only one year supervisory ratings, while as I had 2 years supervisory ratings, submitted as per the stipulated requirements for application package. If there is GAO rule that one year ratings was enough for a favored candidate (selectee) but 2-year ratings were required for others, then that rule was a clear violation in the sense it was not applied to everyone on equal basis because for that person for whom the 2-year requirement was waived, that person had only one year experience in the lower grade (GS-13 in this case), while as I had  more than 4.25 years of experience in the lower grade (GS-13) for better judgment of performance in the lower grade and for considering more valued  experience in the lower grade.  Thus, the average 2-year supervisory ratings for the selectee was much less than the average for me. Yet that person was promoted to GS-14 position, although I had many years of valued service at GAO in

19

a lower grade (GS-13), while as the selectee had only one year service. The selectee did not have a completed Ph.d.

The second selectee (announcement PEMD-85-3) and I had about the same (4.02 vs. 4.10) average ratings for a 2-year period. The selectee had less than 3.75 years of service in a lower grade (GS-13) while I had more thane 4.25 years. The selectee did not have a completed Ph.d. The selectee did not have any publications. The selectee was far younger than me and less than 40 years old.

I was one of the applicants in the Best Qualified List for a promotion announcement (RCED-89-9), but selection was not made because the favored and pre-selected applicant had bad ratings (unacceptable) for "working relationships" in an earlier year. GAO did not want to select the preferred applicant against me because GAO expected a potential age discrimination complaint by me against GAO in promotion selection. Also, it was a suppression of selection of my application for promotion as a reprisal against me because of my earlier ADEA violation complaints against GAO in promotion selections. Since GAO wanted to promote a favored and pre-selected applicant with bad ratings in an earlier year, who was in that Best qualified List, GAO intentionally cancelled that announcement and re-advertised within 60 days (although the rule was that it should be at least 6 months before the agency re-advertise, as I understand), with a stipulated requirement of current year ratings only and applicant self-rated score for 4 types of work elements. Then, after my application was considered inconsistently and illogically in reference to other applicants with reference to self-rated score, GAO selected the same candidate, whom GAO wanted to select but could not in the cancelled announcement because I did not have bad ratings, with bad ratings (unacceptable) in an earlier year but were not shown in

20

the application package in the re-advertised announcement with a requirement of only the ratings in current year (the year of promotion), who was far younger than me and was less than 40 years old.

In 1998, I applied for OCE-99-1 and found that the selectee's application package did not have a completed Form 88 signed by the applicant and the supervisor with the ratings for the Quality Ranking Factors, as stipulated in the promotion announcement.  The rules, as  stipulated in the announcement, stated that this form **must be** submitted along with the application form **(GAO order 2335.8).**  Moreover**,** the applicant did not submit completed application, which was also required as stipulated in the promotion announcement and GAO order 2335.8. Therefore, the applicant with an incomplete application package was selected by the selecting official.  If the forms, which **must be** submitted, were not found in the application package, then the panel, under the rules, must take that application out of the panel's consideration for making the Best Qualified List

In 1998, in the case of RCED-99-3, I found that the selectee did not submit all the required forms, supervisory ratings, Form 88, and an application but submitted only a form showing an interest in the promotion position. That applicant was promoted**.**  According to the GAO rules, an applicant with out submitting all the required completed forms should not be considered as an applicant and that application should be rejected and should not be placed in the Best Qualified List for promotion selection. If GAO rules were followed and , if  that application was rejected, my application was the only application in the Best Qualified List for consideration for promotion and I should have gotten promotion because I was in the Best Qualified List and I was highly qualified from all aspects combined, which include academic qualifications, supervisory ratings, ratings on Form 88, experience in various GAO issue areas, professional programming, and experience in professional write-ups and publications. I believe that the

21

selectee had only a B.S degree and far younger than me and far less than 40 years old. Moreover, my application was rejected when I missed submitting my form 88 as a part of my application package for a promotion announcement in 2000 (ARM-01-3).  But when the applicant **did not submit all the required completed forms** for RCED-99-3, which was announced GAO-wide to receive all the well-qualified and competent applicants from all the divisions in GAO, that applicant was selected for promotion out of two applicants, one of them was me.  If the forms, which **must be** submitted, were not found in the application package, then the panel, under the rules, must take that application out of the panel's consideration for making the Best Qualified List

The above examples indicate that there were no minimum standards for promotion selections and the personnel rules were not followed although they were considered as violations, if not followed.  This type of environment might have made well-qualified and experienced older GAO staff members to strongly believe that  the management might have promoted those whom they wanted to promote, even by abrupt  violation of GAO personnel rules, based on a facially neutral but apparently meritorious (CSP and MSP) promotion selections but, in reality, based on artificial standards manipulated by the management and highly subjective discriminatory decisions against the experienced and well-qualified older professional staff members in GAO.

**ATTACHMENT B**

**DEMEANING REMARKS AND HOSTILE WORK ENVIRONMENT**

The selecting official for the position OCE-99-1 has expressed his contempt of me a number of times on the basis of my age not only privately but also in public places.  The selecting official in the alleged promotion selection in 1998 abused me before the promotion selection stating in demeaning nexus "I got my BAND III promotion before my 40th birth day. We do not allow you to succeed in GAO."  He made this statement at the end of his conversation with me and hung up the telephone immediately.

While the selecting official was discussing the supervisory ratings for the plaintiff privately in his office, he specifically made a statement "I do not want to go by the congressional committee staff" and gave a lower rating "superior" instead of  "outstanding" for one of the quality ranking factors for the  "health policy" in the required Form 88.  The plaintiff did not ask the selecting official why he made a reference to  "the congressional committee staff" relating the rating for me.  For the second quality ranking factor in Form 88 the plaintiff was given  "outstanding" rating. The plaintiff simply signed the Form 88 with the downgraded rating for one of the Quality ranking factors in Form 88. The Form 88 indicates that the signature of the rate does not indicate that the ratee agreed with the rater, who was the selecting official. Evidently, the selecting official, the rater, willfully rated me down because I was competing with the favored and pre-selected far younger person than me.

After the selection, the selecting official came to my office room and reported that I was not selected.  While leaving my office room, the selecting official made a statement that the "the selectee is my girl friend.  We do not go by your chastity here."  After he made that statement, he giggled and heckled around and left my office room immediately.  I was perplexed as to why he made that statement.  However, I never asked the selecting official why he made that statement because of fear of possible retaliation by the selecting official in different ways.  I

thought that the retaliation would create an unusual mental stress and consequent health problem for me. The selecting official has abused 5 times in the public places in the building on a personal basis and created an abusive workplace environment and made the plaintiff to work in an atmosphere of constant fear and threat in the workplace.

In 1998, in the case of RCED-99-3, I found that the selectee did not submit all the required forms, supervisory ratings, Form 88, and an application but submitted only a form showing an interest in the promotion position. That applicant was promoted**.** According to the GAO rules, an applicant with out submitting all the required completed forms should not be considered as an applicant and that application should be rejected and should not be placed in the Best Qualified List for promotion selection. If GAO rules were followed and , if  that application was rejected, my application was the only application in the Best Qualified List for consideration for promotion and I should have gotten promotion because I was in the Best Qualified List and I was highly qualified from all aspects combined, which include academic qualifications, supervisory ratings, ratings on Form 88, experience in various GAO issue areas, professional programming, and experience in professional write-ups and publications. I believe that the selectee had only a B.S degree and far younger than me and far less than 40 years old. Moreover, my application was rejected when I missed submitting my form 88 as a part of my application package for a promotion announcement in 2000 (ARM-01-3).  But when the applicant **did not submit all the required completed forms** for RCED-99-3, which was announced GAO-wide to receive all the well-qualified and competent applicants from all the divisions in GAO, that applicant was selected for promotion out of two applicants, one of them was me.  This was again intentional disparate treatment of me based on age similar to disparate treatment of me based on age, as discussed before.  This was in the case of promotion announcement OCE-99-1 for which the selectee did not submit the required Form 88 and the application form but was promoted while my application was rejected because I did not submit Form 88 for the announcement ARM-01-3.

**ATTACHMENT C**

**STATISTICAL EVIDENCE OF AGE DISCRIMINATION IN GAO**

**A.  Evidence of Age Discrimination In PAB Report**

The Personnel Appeals Board  in its report to the Comptroller General, GAO,  entitled *Promotions of Banded Employees (1991-1995)*, dated September 30, 1999, and signed  by the chairman of the PAB, stated that there were statistically significant disparities in promotion rates for those 40 and older and under 40. The odds ratio was statistically significant at 1-percent probability level of significance (or with 99-percent level of confidence). This phenomenon was found to be true in the regional offices, head quarters, and in the entire GAO (see pp. 22-24 of the PAB report).

**B.  Age Discrimination As Evidenced in GAO Data**

In the EEOC examiner's report in Fogle's Black Class Action complaint the Hearing Officer wrote that promotions at above GS-13 level were based on "largely uncontrolled subjective judgments."   Moreover, Honorable David M. Walker, Comptroller General of the U.S. General Accounting Office (CG chat on September 22, 1999 broadcast through out GAO) stated that rating inflation was bad as it was, he would not rate himself by all 5.0, the rating system was not functioning as it should have been functioning, the ratings were inflated since 1984, ratings should be made against standards, the appraisal system was broken and needed to be fixed.

Because of  irregularities, highly subjective nature of panel processes, self-serving objectives and operational manipulations, non-functioning of rating system, and non-selection of well-qualified and experienced older professional staff members for promotions in many cases, and recurring intentional downgraded performance evaluations,  and consequent frustration, **similar to Chennareddy**,  many older professional staff members might have had **a chilling effect**, and,

25

thus, they might not have applied  for many promotion announcements.  The plaintiffs in the

Age Class Action might argue and  might be able to prove  at the time of court hearings that the

panel members, appointed by the selecting officials,  themselves might have operated to make

the selection process  appear facially neutral and  camouflage the highly subjective age

discriminatory  decision processes, which were branded as  the Competitive Selection Process

(CSP) or Merit  Selection Process (MSP) to frighten the potential victims so that they might

become afraid of  making discrimination complaints and taking them to the federal district court.

 Moreover, the GAO management discriminatory operations culminated in successful past

discriminatory complaints, which were discussed in the previous sections.

     In this section, a discussion of how processing application data might show up distorted

information related to the intentional discrimination in employment.  Suppose there were 100

promotion announcements in a particular year in GAO and each announcement had received 100

applications. Therefore, the total number of applications was 1,000.  Suppose the total number of

eligible potential applicants was 1000 in the younger age group and 1000 in the older age group

(these numbers were chosen only for simplicity). Suppose there were 8 applications (for 100

promotions) on the average from each of the 1000 eligible potential applicants in the younger

age group and 2 applications (for 100 promotions) on the average from each of the 1000 eligible

potential applicants in the older age group. Because of **chilling effect** (there is no proof for non-

existence of chilling effect), the number of applications for each promotion announcement from

the eligible potential applicants in the older age group was smaller, as given in this example.

The total number of applications (10,000) contains 8000 from the younger age group and 2000

from the older age group. Suppose the promotions awarded were 80 for the younger age group

and 20 for the older age group.  Based on the actual number of applications, it appears (falsely)

that there is no age discrimination because the disparity is zero due to the fact that the number of

promotions awarded to each group was proportional to the actual number of applications (1% for each group).  But, in fact, there is substantial age discrimination because the promotion rate was 8-percent for younger staff members and 2-percent for older staff members. I strongly believe that this example might have reflected the true situation in promotion selections in GAO.

To avoid the distortions created to the normal workforce in case of applications, the eligible wokforce, as used in the federal government legal cases, quoted in this paragraph and at the bottom of this section, was correctly considered in my statistical opinion for establishing the prime facie case of age discrimination, as discussed in the following section.  The legal basis for my opinion is based upon the Supreme Court's holding that a statistical comparison must relate to the available pool of qualified persons to be probative under Title VII. Hazelwood School Dist. V. United States, 433 U.S., 299 (1977). This principle is also applicable to age discrimination cases. Lindsey v. Southwester Bell Tel. Co., 546 F2.d 1123 (5th Cir. 1977).

Based on statistics provided to me by the counsel for the Age Class Action (Civil Action No. 87-3538 JGP) on 26th of April 1995 (tables attached to my previous affidavit and opinion on April 26th of 1995), it is my opinion that age discrimination was evident beyond doubt in GAO. The tables in my prior affidavit provided statistics related to promotions from GS-12 to GS-13, from GS-13 to GS-14, from Band I to Band II (for relevant years only in the case of Band I to Band II) for the years 1984 through 1992.  Data related to promotions from GS-14 to GS-15 and from Band II to Band III were not included. GAO has not provided the statistics for the years 1993 through 2005.

For each of the years individually, based on the promotion rate for persons under 40, a no less than 2.73 "T" value has been computed.  The "T" value (in this large sample it is "Z"  value)

is a standard normal statistic (or variate measure) used as a standard criterion in statistical testing. The normal "T" value (or Z value) for a one tailed test (for the positive side of age discrimination) at 1-percent probability level of significance is 2.326 (see Freund, John E, (1962). *Mathematical Statistics*, Prentice-Hall, Inc., Englewood Cliffs, N.J., pp. 366-367). This means that for each year involved and in each grade or Band for which data were provided, the probability of making the statement that there was no age discrimination was extremely small, far less than 1-percent or l in 312 chance or practically zero ( T value was 2.73 as compared to 2.236). In other words, the probability of committing an error in making the statement that there was age discrimination in GAO, considering each year during 1984-1992 and in each grade or Band for which data were provided, was less than 1-percent or 1 in 312 chance, or practically zero. The computed "T" value was far above the minimum value required to establish the prime facie case of age discrimination. In other words, the chance of refuting age discrimination (or asserting age non-discrimination) is 1 in 312 or practically zero.

My opinion, as stated above, is based on a legal precedent, which I am aware. The Supreme Court unanimously and explicitly declined to exclude subjective criteria from disparate impact in EEO cases, reasoning that "if disparate impact analysis is confined to objective tests, employers will be able to substitute subjective criteria having substantially identical effects, and Griggs will become a dead letter." , 108 S. Ct. 2786 (1988). The court found that intent could be proven by showing statistically the disparate impact of subjective promotion criteria in employment. Watson v. Fort Worth Bank and Trust, supra. To establish a prime facie case of age discrimination, the proper comparison is between the proportion of promotions for those qualified pool of applicants under the 40 and for those 40 and over.

Instead of keeping the records and all the paperwork related to all promotion announcements and selections to enable processing of individual as well as class discrimination complaints, GAO, as I believe and as I was informed by the counsel for the Age Class, appeared to have informed the court in the ongoing Age Class Action, that data were not available in

28

GAO.  If what GAO informed the court was true, GAO had been destroying all that material. Such an activity, not enabling the complaint processing, might be considered as an illegal activity from the judiciary point of view. However, I was aware a database for many years going back to 1985 maintained by a GAO management and staff members (names are  not known to me).  I was aware that such data were processed and presented in terms of charts and probably tables, which were available periodically to the management and GAO staff, if not every year. If data were not available, as GAO informed the court in the GAO legal arguments against Age Class Certification, which is pending in the federal district court, how GAO had been in a position to present charts and probably tables periodically in the past.  Evidently, detailed data had been available but GAO had refused to provide such detailed data to the plaintiffs of the Age Class action in the court. This amounts to GAO's efforts to make the plaintiffs fail in providing age discrimination proof  in GAO.  In fact, GAO provided data for some years to PAB (Personnel Appeals Board), which analyzed that data and reported to the Comptroller General, GAO, that there was statistical evidence of age discrimination in promotions in GAO.

Considering application data for promotions may have flaws for drawing authentic (or reliable) statistical inference related to age (ADEA) discrimination complaints, especially, in GAO.  The arguments against processing of application data for statistical proof of age discrimination, in general, and GAO, in particular, are provided in the following paragraph.

According to GAO rules, the minimum qualifications for a GAO staff member to be eligible for applying for a promotion announcements to a higher level Evaluator, Evaluator with special quality ranking factors, and Evaluator-related specialist positions ( the word "Analyst" replaces the word "Evaluator" in recent years because the title of professional staff member in GAO was changed) are:  (1)  A four year degree (on the job experience can be substituted to education if one does not have minimum education) (2)  At least 52 weeks (1 year) of experience in the lower grade.  In employment discrimination cases, the plaintiff must consider only the minimum objective qualifications necessary for one to be eligible for promotion.  Only

the relevant statistical data must be considered initially by the plaintiff. However, the court may require that all factors relevant to a promotion decision may be included in statistical analysis at the time of trial, after initially proving much more relaxed requirements for certification of the age class.   Thus, I made the statistical analysis based on the data related to eligible staff members for promotions because this was the only statistical database available. Moreover, because of **chilling effect (similar to my situation stated in previous section),** many older professional staff members might have not applied for promotions thinking it was a futile exercise of taking time and going through the process for final age discriminatory subjective promotion selections.  At the time of hearing, many older staff members might testify, similar to my case that they did not apply for many promotions because of **chilling effect** on them.  GAO has no proof for any argument that there was non existence of such a **chilling effect**.  Therefore, the total number of **actual applications** from older professional staff members in the GAO database is a misleading number, far below than the potential number of applications, if the promotion selection process was fair and non-age-based-discriminatory subjective decision. Thus, considering the actual number of applications for promotions from older professional staff members is unfair, unreliable, and non authentic but a fake exercise for assessing statistical proof of age discrimination. Considering actual number of applications might not be a correct decision for both older and younger professional staff members but more so for older staff members, as explained before, because many staff members might apply for many (possibly 4 -8) promotion announcements, in which case, the number of applications is far higher than the number of staff members applied for promotions.  If a staff member applied for 10 promotion opportunities, he/she took only one promotion, if selected, but he/she had 10 applications in GAO database.

Moreover, in legal cases—Valentino v. United states postal Service, 674 F.2d 56, 73, 28 FEP Cases 593 (D.C.  Cir. 1982)D, and Hogan v. pierce, 31 FEP Cases 115 (D.C. D. Ct. 1983), Davis v. Califano  613 F2.d 957 (D.C. Circuit. 1979)—workforce as measured by qualified potential pool of applicants for promotions but not the actual applications was considered for

deriving statistical inference related to discrimination in promotions in employment for establishing prima facie case.  That is what I did to establish a prima facie case for age discrimination in GAO.

**SIGNATURE AND NOTARIZATION**

     **I declare under the penalties of perjury that the foregoing statements are true and correct.**


V.chennareddy _____                    _____ 8/25/2006 _____

Signature                                        Date

Venkareddy Chennareddy

Subscribed and sworn to before me this 25 day of August, 2006

NOTARY PUBLIC   JULIE VIDMAR

 STATE OF COLORADO                              [seal]

MY COMMISSION EXPIRES     05-15-10