# Defendants' Exhibit 1

United States General Account.   , Office

# GAO

# Complaint of Discrimination

2004 JAN -7 PM 5: 26

For Further Information about the GAO Discrimination Complaint Process see
GAO Order 2713.2.

**1. Name** (last, first, middle initial)
DAVIS, ARTHUR L

**2. Address** (number and street, city, state, and ZIP code)
801 Howard St #1200
SF CA 94105

**3. Home Telephone Number**
707-647-2730

**4. Work Telephone Number**
415-904-2230

**5. If A GAO Employee**  Grade/Band II
Position _____
GAO Unit _____

**6. If a GAO Applicant**
Position Title/Series _____
Grade/Band applied for _____

**7. GAO Unit Alleged To Have Discriminated**
SI & SFRO

**8. Date On Which Most Recent Alleged Discrimination Occurred** (month, day and year)
See attached letter

**9. Check the basis(es) on which discrimination is alleged.** (Check all that apply.)

[X] Race, If So, Identify Your Race _____

[X] Color, If So, Identify Your Color _____

[ ] Religion, If So, Identify Your Religion _____

[ ] National Origion, If So, Identify Your National Origin _____

[ ] Sex, If So, State Your Sex _____

[X] Age, If So, State Your Age _____

[X] Disability, If So, State Your Disability  muscular/Back/leg

[X] Retaliation  See attached letter

**10. Has this complaint been discussed with a Civil Rights Complaint Counselor?** (Check one.)
[X] Yes    [ ] No

**11. Counselor's Name**
Allen Elliott

**12. Has the GAO Mediation Program been explained to you as a possible means of resolving your complaint?**
(Check one.)  [X] Yes    [ ] No

**13. Date of Initial Contact with Counselor.**

**14. Do you have a representative or legal counselor?** (Check one.)
[X] Yes    [ ] No

**15. Name of Representative or Legal Counsel.**
Walter Charlton, Esq

**16. Address**

**17. Telephone Number**
410-571-8764

**18. Briefly describe the alleged discrimination action(s) and the issues in your complaint.** If more space is needed, please use attached continuation page.

See attached letter

**19. What corrective action(s) are you seeking?**
TBD

**20. Signature**

**21. Date**
1/3/06

OPR:CRO

GAO Form 51 (Rev. 10/00)

## CHARGE ALLEGATIONS

For the last several years I have been experiencing a series of acts aimed at reprisal or retaliation for my civil rights efforts, including a presently ongoing case in the PAB, a Motion to be added as an individual participant, and a class representative if a class is certified in an ongoing class action in the United States District Court, and for raising with top management questions brought to me by other employees when I represented them as chair of the ACCR (Advisory Council on Civil Rights) before it was disbanded for reasons, with most reasonable people, including the CG, do not believe are true.

Recently, I have been singled out for disparate treatment as to my time cards and my word has been challenged as to my time spent on the job, and I have been ordered to report my comings and goings in a special manner designed to demean my status, and subject myself to special reporting allowing untrue criticism of my attendance, and other nonprofessional attacks on my character.

Specifically, I have been subjected to the following special demeaning treatment. On April 23, 2003, the writer stated that he advised me about the accuracy of my Time and Attendance. I told the writer that I was here on April 7th but that I was not here on the April 18th and that I would make a prior period adjustment the next pay period. Continuing along this line, the writer brought another instance where he maintained that one July 14th and 25th I was not in the office. On July 13th I was in Sacramento, California assisting my daughter who was in a car accident and I did not work on the July 14th. But, on July 25th I did work and I have affavidavits attesting to that fact. I did not turn my computer on all that day because I was reading and cleaning up my office. For the last 30 years whenever I have unscheduled leave, I **always** make adjustments at the next pay period. Though, these are nick-picking details, they are "part and parcel" of a bigger issue pertaining to disparate treatment and discrimination.

As a 30 + year (1973) employee of the GAO I have always adhered to government policies and honest practices and consider these actions for what they are, calculated harassment designed to make me quit. I won't! …. And I will leave when I am ready…***not*** before or after. To illustrate, I was told that I could not leave my computer on, though headquarters; especially IT never said that this could not be done, and has not promulgated any formal direction. My rationale for leaving my computer on with the screen *dark follows*. This is an industry's practice. Specifically, Microsoft recommen*ds* that *Windows maintenance tasks be performed* only when the computer is on. They added further that the easiest way to maintain your computer is to leave it running all the time and schedule maintenance to happen at night. I schedule my maintenance to occur at midnight to 3 am everyday so that the computer is ready for me at 6:00am the time I report to duty. This is a hostile work environment, for example.

I am a disabled American veteran, and African/Indian American decent and by virtue of my 30 years experience and age entitled to a presumption of honesty, the same as all other professional level employees at GAO. This information is in my personnel jacket and has been there since 1973. There are times when I have difficulties getting out of bed to come to work and I take leave and go to the Veterans Administration Hospital for treatment of my service-connected disability.

I respectfully request that GAO management be **Ordered** to cease and desist from discrimination and acts of disparate treatment and make allowances, as the regulations provide, (the State of California does) for any disability for which I continually suffer as is my right as a disabled veteran; and unspecified general and specific damages and legal expenses.

ADO's: David Walker, CG
James White, Director, SI, Tax Issues
Charlie Daniel, Assistant Director, SI, Tax
Jonda Van Pelt, Assistant Director, SI, Tax
Kerry Dunn, Field Office Manager, WRO-SF
Et al
Counsel represents me and any inquiries should be addressed to him: Mr. Walter Charlton, (410)-571-8764
Signed under the penalty of perjury that the above statements are true to the best of my ability.
/Signed/
Arthur L. Davis
September 5, 2003

P.S. An electronic version of this document is being sent now but a hardcopy will be mailed to the Office of O and I( formerly the Civil Rights Office ).

# Defendants' Exhibit 2



**United States General Accounting Office**
**Washington, DC 20548**

**Opportunity and Inclusiveness**

## Notice of Right to File a
## Discrimination Complaint

| Name of Person Counseled<br>Arthur L. Davis | Office/Team<br>SFFO/ SI |
|---|---|
| Name of Counselor(s)<br>Allen R. Elliott | Date<br>12/02/03 |

This is to acknowledge that on the above date, the final informal interview was held related to the matter you presented during counseling.

If you believe you have been discriminated against on the basis of race, color, religion, sex, national origin, age, or disability, or subjected to retaliation, because of protected EEO activity, you have the right to file a complaint of discrimination. The complaint must be filed, within 15 calendar days after the receipt of this notice, in person or by mail, with the Office of Opportunity and Inclusiveness, U. S. General Accounting Office, 441 G Street, NW, Washington, D.C. 20548.

The complaint must contain:

- Your identity as the aggrieved person or complainant
- A description of the action(s) or practice(s) that form the basis of your complaint. Only like or related matters discussed in pre-complaint counseling or mediation can be alleged in the complaint.
- Your address and telephone number, and that of any representative.

Should you retain an attorney or any other person to represent you, you or your representative must immediately notify the Managing Director of the Office of Opportunity and Inclusiveness in writing.

If you wish to file a class complaint, a counselor will explain the class complaint procedures and the responsibilities of a class agent required by chapter 4 of GAO Order 2713.2.

Signature _____  Date _1/5/04_

[Note: Please sign and date this form upon receipt and return a copy to this Office.]

Defendants' Exhibit 3

**United States General Accounting Office**

# GAO

# Complaint of Discrimination

For Further Information about the GAO Discrimination Complaint Process see
GAO Order 2713.2.

| 1. **Name** (last, first, middle initial) | 2. **Address** (number and street, city, state, and ZIP code) |
|---|---|
| Moses, James D. | 1662 Cyrene Drive |
| | Carson, CA 90746 |

| 3. **Home Telephone Number** | 4. **Work Telephone Number** | 5. **If A GAO Employee** | |
|---|---|---|---|
| 310/762-9006 | 213/830-1085 | Grade/Band | II |
| | | Position | Senior Analyst |
| | | GAO Unit | LAO |

| 6. **If a GAO Applicant** | 7. **GAO Unit Alleged To Have Discriminated** |
|---|---|
| Position Title/Series _____ | Administration of Justice |
| Grade/Band applied for _____ | |

8. **Date On Which Most Recent Alleged Discrimination Occurred** (month, day and year)

October 18, 200` and october 23, 2000

9. **Check the basis(es) on which discrimination is alleged.** (Check all that apply.)

☐ Race, If So, Identify Your Race _____

☐ Color, If So, Identify Your Color _____

☐ Religion, If So, Identify Your Religion _____

☐ National Origion, If So, Identify Your National Origin _____

☐ Sex, If So, State Your Sex _____

☑ Age, If So, State Your Age  59

☐ Disability, If So, State Your Disability _____

☑ Retaliation   For joining the Chennareddy Age discrimination suit as an intervenor

| 10. **Has this complaint been discussed with a Civil Rights Complaint Counselor?** (Check one.) | 11. **Counselor's Name** |
|---|---|
| ☑ Yes    ☐ No | Allen Elliott |

| 12. **Has the GAO Mediation Program been explained to you as a possible means of resolving your complaint?** (Check one.) ☑ Yes  ☐ No | 13. **Date of Initial Contact with Counselor.** 11/20/01 & 11/3/00 | 14. **Do you have a representative or legal counselor?** (Check one.) ☑ Yes  ☐ No |
|---|---|---|

| 15. **Name of Representative or Legal Counsel.** | 16. **Address** | 17. **Telephone Number** |
|---|---|---|
| Walter T. Charlton | 230 Kirkley Road Annapolis, Maryland 21401 | 410/571-8764 |

18. **Briefly describe the alleged discrimination action(s) and the issues in your complaint.** If more space is needed, please use attached continuation page.

Out of 49 Band II's in the Administration of Justice Issues (currently, Tax and Administration of Justice), I was rated number 47 for the period ending 9/30/00.  My average rating score was 3.28 as compared to the average for all 49 Band II staff of 4.23 and a median of 4.29.  My average rating score was almost a full point below the overall average and I was the lowest rated Band II in the TAJ group in the

19. **What corrective action(s) are you seeking?**
The 2000 and 2001 ratings to be changed, merit pay category of commendable to be changed and monetary compensation for pain and suffering and embarrassment that this has caused me.

| 20. **Signature** | 21. **Date** |
|---|---|
| *James D. Moses* | 1/18/02 |

OPR:CRO

**18. Description of the Alleged Discrimination Continuation Sheet**

Los Angeles Office. I didn't fair much better for the rating period ending 9/30/01. For this period my average rating score was 3.67 as compared to the overall average of 4.25 and a median of 4.33 for 86 TAJ Band II staff. Again my average rating was significantly lower than the overall average and, for the second year in a row, I was the lowest rated Band II in the TAJ group in the Los Angeles Office. Go back 25 years or longer in my career with GAO and you will not find a rating nowhere near as low as those for the last two years. In fact you will find that I was always in or near the top 20 percent of staff in my grade. I believe that any reasonable person, after looking at all of the facts, would have to believe that my ratings for the last two years do not reflect my actual performance and that other factors had to play a part. I firmly believe that the other factors involved discrimination in some form.

I started my career with the Los Angeles Office of GAO about 35 years ago. During this long and, I believe, very successful career, I have worked in a variety of positions and issue areas. In 1984, I was promoted to GS-14, one of the top managerial positions in the field offices at that time. I managed several major issue areas and had staff of 9 or more people in the office reporting directly to me and staff in other offices indirectly reporting reporting to me.

What happened in 2000 and 2001 for me to get such low ratings? Three major things happened that I believe, negatively impacted my ratings. But before I get to the three things that happened, let me mention the principal characters that I believe are involved in attempting to trash my career in GAO. The primary character and the one with the most influence and power and the supervisor of the next three individuals I am going to name, is Richard Stana, Director, TAJ. The three individuals that I reported to are all assistant directors in TAJ who reported to Mr. Stana. These individuals are Danny Burton, TAJ Dallas; Weldon McPhail, TAJ Washington and James Blume, also, TAJ Washington. Now for the three things that happened in 2000 and 2001. First, Mr. Stana became very upset with me when I told him that I did not want to report to Sam VanWagner who was in the same grade and had achieved the same success as me in GAO; second, I became an intervenor in the Chennareddy Age Discrimination suit; and third, I got older. I don't believe GAO values the experiences and knowledge of many of its older people. Another factor that could have played a part, primarily with Mr. Stana, is the fact that I am an outspoken Black male.

The First Factor

For the first time in my GAO career I was assigned to report to a staff in the same grade, office and who had, basically, achieved the same success as me in the agency. The assignment was review of INS Task Forces in Los Angeles, Code 183642. I first expressed my concerns to Danny Burton, Assistant Director from Dallas who was in charge of the assignment. Danny didn't seem interested in my concern so I told him I wanted to discuss it with Rich Stana, Associate Director, to whom Danny reported. The three of us talked by telephone. I explained my concern to Rich in detail. His initial response was that it was not unusual for a Band II to be reporting to another Band II. I explained to Rich very clearly that this was not as simple as he was trying to make it. I requested to be reassigned if the job structure stayed the same. Rich told me that Marty Ferber, the LAO Manager at the time, had suggested that the assignment structure stay the same. I told Rich that Marty and I had a rocky relationship and that his opinion was biased. Rich said he wanted to think about my concern and he would get back to me. He said that he was disappointed with me for bringing this concern and said that I was wasting job time. Danny Burton supported Rich's position. These individuals showed no interest in something that was very important to me. I told them that I was surprised by their reaction and that I believed my age was playing a part in how I was being treated. Danny got back to me the next day and told me that Rich wanted to keep the structure the same. I told him I wanted to here this from Rich. After some discussion, Rich said that I would report directly to Burton the same as the EIC, Sam VanWagner.

Continuation page for Moses Complaint

The Second Factor

On August 21, 2000, I signed a declaration to become an intervenor in the Venkareddy Chennareddy Age Discrimination suit against GAO. I believe that Rich Stana and Danny Burton were aware of this prior to preparing my 2000 rating. I firmly believe that these two individuals would freely to retaliate against me for exercising my right to join as an intervenor in the ongoing class action suit based on the way they had treated me on this assignment and their attitude regarding my concern about the assignment structure. I believe that joining this suit negatively affected my 2000 rating. I also believe that joining the Chennareddy suit negatively affected my 2001 rating.

At the end of the assignment and for the rating period ending 9/30/00, Danny, with Weldon Mcphail's input, gave me the lowest rating that I have ever received in GAO. Danny Burton and Weldon McPhail prepared the 2000 rating together because I had worked for both. Half of the rating period was spent finishing up a job for Weldon and the other half on the new job for Danny. Weldon rated me on the same assignment in 1999 and gave me one of the highest scores in the TAJ group. It would normally be very difficult to understand how my ratings from McPhail could cover both extremes on the same assignment, until you add Stana to the equation. You see, Rich Stana, without my knowledge, told Weldon to give me a low rating in 2000. The other participant in my 2000 rating was Danny Burton. Danny prepared my rating in 1998 and recommended me for an award as a result of my performance on his assignment, which I received. Again the common factor here is that Danny was reporting to Rich. I am convinced that Rich Stana intimidates the assistant directors who report to him.

The third Factor

I really believe my age had something to do with what has happened to me over the last two rating periods.

In July 2000 we had to indicate our assignment preference (this was prior to the end of the job with Danny Burton. I had indicated a preference in 3 jobs and I had asked for EIC roles. The staffing meeting was held on 7/13/00. On Friday, 7/14/00, Laurie Ekstrand, Director, GGD/Justice, called to inform me about the results of the staffing meeting. She told me that none of the assistant directors wanted me as neither an EIC nor a member on any of their jobs because of what Weldon McPhail, Danny Burton and probably, Rich Stana had said about my performance. I was shocked by what Laurie told me. I was also angered that top management, including Laurie, would accept such irresponsibility from their assistant directors, especially since no one bothered to talk to me about what was said at the meeting. (Please see attachment A for more detail on this telephone call and my reaction).

On 8/11/00, I sent a memorandum to Norm Rabkins, Managing Director, Tax and Administration of Justice about a meeting I had with Laurie Ekstrand and Rich Stana on

8/1/00 about the 7/13/00 staff meeting. (Please see Attachment B, for a copy of the memo). I was floating with no assignment, my career was going down the drain, I still wanted leadership roles and I thought Norm would help. He didn't. To his credit, however, he had not officially taken over the Managing Director role in TAJ. He told me that he turned my memorandum over to Nancy Kingsbury, Acting Assistant Comptroller General, General Government Division. Sadly, no one ever contacted me about my memorandum. I mean no one seemed to care what happened to me. Remember, I had put almost 35 good years of work in this GAO organization. Not only had I done audit work, but I was always heavily involved in collateral duty activities. I was the Civil Rights Counselor in Los Angeles for about 20 years and still acts in that capacity when someone needs help; I served as a primary recruiter; and I am currently the mediator for the Los Angeles Office.

I was assigned to the INS Immigration Benefit Fraud job With Bonnie Hall as the EIC and Jim Blume as Assistant Director. Bonnie Hall is a Black female, much younger than me and who had reported to me for about 10 years in my role as issue area manager. Laurie Ekstrand told me that Weldon McPhail suggested this arrangement.


I worked hard on the INS assignment and I got along with Bonnie Hall and Carla Brown the other Black female that was assigned to the job. I had little direct contact with Jim Blume on the assignment. During the little direct contact that I did have with Jim, he was very complimentary of my work.

Jim Blume gave me the low 2001 rating. But again the common factor is present, Richard Stana to whom Blume reported. I am attaching a document (Attachments C) that will show how I felt about Jim Blume's rating. Jim Blume was not honest or fair in his rating of me and he knows this. Rich Stana signed the rating that was sent to me. Jim Blume didn't sign or date the rating. Jim never sat expectations for me, provided feedback or discussed the rating or my performance during the course of the assignment as required by GAO performance standards. I had a lot of impact on the INS job and both Jim and Rich are quite aware of this.

My merit pay category for 2000 and 2001 was commendable. There were no monetary increases for me in this category. There probably wouldn't be any monetary increases for me in the next merit pay category because of where I am in the salary scale. So, it not really the money that concerns me in the merit pay categories. But I, like everybody else, want to be recognized appropriately for my work. I assume that very few TAJ people were placed in the commendable merit pay category. Based on some conflicting information that Jim Blume provided to Bonnie Hall, I may be the lone person in this pay category and I don't believe this is right. I believe my performance deserved much better than this.



# GAO

**Memorandum**

Date:          July 20, 2000

To:            Director, GGD/Justice – Laurie Ekstrand

From:          Senior Evaluator, Los Angeles – Jim Moses

Subject:       July 13, 2000 Staffing Meeting

You called me on Friday morning (7/14/00), to inform me about the results of the staffing meeting held the day before. You told me I wasn't assigned to a new job. I was a bit puzzled because I had indicated my 3 choices (1st and 2nd on Weldon McPhail's jobs and 3rd on Jim Blume's job). There were several other jobs on the list as well. You told me that none of the assistant directors wanted me as EIC on any of their jobs and I had requested EIC roles. You also told me that since I only wanted EIC roles, none of the assistant directors wanted me as a member on any of their jobs. Prior to the meeting I had called and discussed my interest in Weldon's jobs and he didn't indicate that he would not accept me. The decision not to staff me appears to put me in major dilemma in the GGD/Justice group.

Laurie, you told me that none of the assistant directors wanted me as an EIC because of what Weldon and Rich Stana said about my performance on the Police Corps assignment. You also told me that none of the assistant directors wanted me in a member role because of what Danny Burton said about my work on the current assignment dealing with INS' role in the LAPD/Rampart scandal. You and I discussed my dilemma and you said that I could call you if I had other questions. You told me that I would be staying on my current assignment but that I would be reassigned in the future. You then told me to have a good weekend.

I experience a range of emotions after talking with you. I experienced anger, frustration, disappointment, and most of all, a feeling that I had overstayed my welcome in this organization. I had to subdue these emotions, however, because I had scheduled two major interviews with INS agents on Friday, which we were able to obtain important information pertaining to one of the findings on the INS job.

I have led two assignments since coming into the GGD/Justice area, one for Weldon and the other for Danny. The assignment with Weldon, dealing with the Police Corps, I thought, went quite well even though it was complicated by several legal issues that required heavy involvement from General Counsel. I received one of the highest ratings in the Los Angeles office last year from Weldon. I don't have the details of what Rich or Weldon said at the meeting but you indicated that Rich feels he spent a lot of time on the assignment. I am sure Rich said more than this but the report for this assignment was issued in February of this year, 5 months ago, and Rich has not discussed with me what he apparently mentioned at the

meeting. I guess Weldon and Rich discussed my performance after the report was issued, but they never told me anything. This is contrary to GAO's performance management requirements that staff be given timely feedback.

The assignment that I led for Danny, dealing with PFNA, I also thought, went well. Danny recommended me for an award on that job which I received. My current assignment, INS Participation in Task Forces, is also for Danny. It's no secret that I wasn't happy about being placed on this assignment. As I am sure you are aware, I had in depth telephone discussions with both Rich and Danny about assigning me to the INS job. In fact, I requested to be assigned to another job. They, obviously, ignored my request. I don't know exactly what Danny said about me at the staffing meeting, but you only got his side of the story.

The statement that none of the assistant directors wanted me on any of their jobs seriously affects me! I have had a long outstanding career here at GAO and, frankly, I was stunned by what transpired at the staffing meeting. Not only have I had many significant accomplishments in the audit arena, I have also positively impacted the lives of many staff through roles that I have filled in management and counseling. Did anybody in this meeting think about the affect this kind of decision would have on me? I am not only talking about the immediate affect, Laurie. I am also talking about the long-term affect. Frankly, I am not exactly sure what I am supposed to do in this situation. I do know, however, that what has happened to me is not fair.

I don't want the recent staffing decision to force me to accept whatever job I am given rather than being able to indicate my choices, including the role I would like, and feel confident that I will be fairly considered. Before being assigned to another job, I would like the opportunity to discuss available options. I still feel somebody should have stood up for me at that meeting. Curiously, not one assistant director has contacted me about this very damaging decision, not even Darryl Dutton who is in the Los Angels Office, Weldon (I requested two of his jobs) or Danny, who I am reporting to on the current INS assignment.

cc: Norm Rabkins, Rich Stana, Weldon McPhail, Danny Burton

# GAO

**Accountability ★ Integrity ★ Reliability**

# Memorandum

**Date:**        August 11, 2000

**To:**          **Managing Director, Tax and Administration of Justice –
              Norm Rabkins**

**From:**        **Senior Evaluator, Los Angeles  Jim Moses**

**Subject:**     **Meeting with Laurie Ekstrand and Rich Stana**

I met with Laurie and Rich on Tuesday, August 1, about the July 13 staffing meeting and my subsequent memorandum. Let me state up front, I was not satisfied with the outcome of the meeting. As you might imagine Norm, I have given this whole situation a lot of thought. One main question that always come to mind is what should I do about what has happened? Should I just leave it alone and go about business as usual, pretending that nothing has really happened? Should I look deep into my inter-self and find a way to deal with the faith that has been handed me? Or, should I defend myself and fight for my honor, dignity and respect for the many wonderful years that I have given to the GAO organization.

Laurie and Rich had their minds made up before the meeting and there was nothing I could say that would make them change. Laurie really didn't have any personal knowledge about the two jobs in question and had to rely on what she was told by Rich, Weldon MePhail and Danny Burton. These are managers she deal with a lot and, obviously, trust what they say more than she trust me. Rich on the other hand did have personal knowledge because the Police Corps job was under him and the he also has the current job dealing with INS' role in the LAPD/Rampart scandal. Also, I am beginning to think that Rich is behind all that is happening to me. I have had some major disagreements with Rich, including the some involving the current job. Rich also had some views on my performance on the Police Corps job that were never conveyed to me until the 8/1, meeting even though the report for that job was issued in February of this year, almost 7 months ago. Now Rich will tell you that he conveyed his views to Weldon who will say he told me. This is not true.

Rich said that he was concern with all the changes that had to be made at the exit conference for the Police Corps job. Well he is right, a lot of suggested changes were tentatively made but when we tried to document them the next day we couldn't. It turns outs our data was correct and I guest this didn't get communicated to Rich. I could go on about the details of the discussion but I don't think it is necessary in this memo. I believe I performed well on the Police Corps assignment and my rating will bare this out. I am willing to discuss the assignment and feel that I can answer any questions about the whole job, including General Counsel and AIMD's involvement.

*1*

Regarding my current INS assignment, Laurie said that what worried her was Danny's statement that I hadn't organized the workpapers.  My workpapers were in binders just like all of the other workpapers.  I imagine Danny said more than this, especially considering the impact it is having on me.  I am ready to discuss my work on the current job anytime.  I explained to Laurie that we normally organize, finalize and index the documents close to the end of data gathering in order to avoid including a lot of unneeded information.  In fact, we are just now organizing and indexing the workpapers because we are getting ready to reference parts of the report.  Laurie then stated, and I quote "all come on now, Marty Ferber told us that the Housing and Community Development issue was taken out of the Los Angeles Office because of your leadership".  I told them this was not true and that other issues including Education and Health were taken out of Los Angeles.  I further explained to them what Judy England-Joseph told me as the reason why Keith Fultz would not keep the Housing issue in Los Angeles.  Rich told me that he didn't believe me.  I fought to bring the Housing issue to Los Angeles, I built it up to where there were 9 staff working in the area, ran it for about 10 years and, to my knowledge, no one ever told me that it was removed because of my leadership.  My ratings will document how well I did in managing the Housing issue.

Rich than summed the meeting up.  He said my explanations showed that "it is all about Jim Moses".  He then told me that I was full of myself.  He said I didn't want to look into myself and accept what had happened.  He said he knew this was hard for me to swallow, but that I should accept it and go on.  I really don't know what Rich was trying to say with these statements.  I guess he was really criticizing me for standing up for my rights.  I think he would see things different if something like this happened to him.

Laurie told me that I was being assigned to a job with Bonnie Hall.  She told me that I would not be the EIC and that she wanted me to do a good job.  I told Laurie that I have a lot of respect for Bonnie and that she was on our first assignment in the Housing area.  I was not given any option even though I did put this job down as my third choice.

Laurie and rich have probably talked to you about this meeting, but I thought it was important for me to let you know, from my perspective, what happened and how I felt about it.  Again, I was not satisfied with their decision.  I think I have established a fine track record as a leader and I feel strongly that I should continue to be in that role.  Norm, I believe you are a reasonable person.  Tell me, do you trash someone's career based on what Weldon and Danny are saying?

United States General Accounting Office

# Performance Appraisal for Band I and II Employees



**G A O**
Accountability * Integrity * Reliability

| 1. Name | 2. Band | 3. GAO Unit |
|---|---|---|
| James D. Moses | II | Los Angeles Office |

| 4. Rating Period | 5. Total Staff Days |
|---|---|
| From: 10/1/00     To: 9/30/01 | |

**Part I(A) Assignment Information:** Describe, (1) job title(s), code(s), summary of assignment(s) objectives; and (2) any unusual job characteristics or factors of complexity.

Review of Immigration Benefit Fraud (440001). This review was requested by the Chairman, Committee on the Judiciary and the Chairman, Subcommittee on Claims and Immigration. We were asked to review INS' actions to address immigration benefit fraud. Specifically our objectives were to address how does INS: (1) manage and carryout its benefits enforcement activities; (2) address its dual responsibility of timely application processing and detecting and deterring fraudulent applications; and (3) measure the results of its benefits fraud enforcement activities. This assignment was both complex and challegening because fraud, in general, is a very difficult area to review and INS' approach to managing benefit fraud was fragmented and unfocused. I also continued to carry out my collateral duties as Civil Rights Counselor and Mediator for the Office by counseling and coaching several employees with personal and job problems.

**Part I(B) Summary of Ratee's Expectations:** Describe ratee's role and expectations for the assignment/period.

As a senior member of the team, I was expected to participate in all facets of this assignment. I was expected to participate significantly in developing the job plan, discussing and defending it with GAO managers, and suggesting revisions as the job progressed. Along with another member on the job, I was expected to visit 2 service centers, a region and 2 district offices. I also accompanied the EIC on visits with INS headquarters officials. I was expected to obtain agency officials views and opinions, pertinent documents, and perform analysis to meet the audit objectives. I was expected to participate in and provide input during job meetings with GAO managers including both the Director and Managing Director. I was expected to write significant portions of the report draft and was specifically assigned to write two major sections. Finally, I was expected to assist with indexing and referencing. In addition to job requirements, I was also expected to carry out my collateral duty responsibilities.

**Part III. Rater's Assessment of Performance.** Summary and dimension-specific narrative as appropriate. One additional page ma be added.

Planning: Always mindful of GAO's core values of accountability, integrity and reliability, Mr. Moses played a key role in planning this sensitive and complex assignment. This assignment started out as a self initiated job and was later turned into a Congressional request because of the potential significant issues that were identified. Mr. Moses efffectively participated with the team in planning this assignment making important suggestions on the researchable questions and other information in the design matrix. In early meetings with GAO management, Mr. Moses showed his versatility in the planning area by responding to questions about the job plan, defending team positions when appropriate and making suggestions for changes in areas that management had concerns. For example, during the design summit meeting the Managing Director favorably commented on several suggestions that Mr. Moses made to clarify several areas in the design matrix. Recognizing that the job plan is a moving document, Mr. Moses was almost always sensitive to identifying, planning, and researching other important issues. For example, when writing a major area in the report, he identified, planned and obtained supporting data for a key finding dealing with weaknesses in INS' technology systems. Data Gathering and Documentation: Mr. Moses identifies and obtains the most relevant data, particularly that needed to support findings and recommendations. For example, for an important finding involving INS' technology systems, he quickly obtained paper documents, had an INS official to respond to specific questions in writing, got agreement on the issue from a high level INS official, made charts and tables to demonstrate the significance of the finding and even contacted a key INS former employee. Data Analysis: Mr. Moses showed outstanding skills in data analysis. He identified key weaknesses in INS' management of immigration benefit fraud that led to strong conclusions and recommedations. For example, while writing the report section on INS technology systems, he identified a report that had pointed out major problems in INS system for detecting and deterring benefit fraud. The report clearly showed that aliens with adverse information in their backgrounds, including criminals, were obtaining immigration benefits. Not only did he identify this major issue, Mr. Moses conducted research and obtained documentary and testimonial support from high level INS officials. Identifying and incorporating this finding eliminated the question about whether the technology section could stand alone in the report.

**Part IV. Signatures**

| | Name (typed) | Band | Signature | Unit | Date |
|---|---|---|---|---|---|
| Rater | | | | | |
| Reviewer | | | | | |
| Ratee | James D. Moses | II | | Angeles O | |

The signature of the rater and ratee indicate that the appraisal has been discussed and the ratee was counseled on his/her performance. By signing, the ratee does not necessarily indicate agreement with the appraisal.

**Part V. Ratee Comments** (optional): Additional pages may be added.

**Part III.  Rater's Assessment of Performance--Continuation Page**

This finding became even larger as a result of the tragedy in New York on September 11th because according to a high level INS official, the Attorney General gave the agency 6 months to implement computer checks on all applications and petitions for immigration benefits. Mr. Moses has shown his strong analytical skills in several other areas including the fact that INS may not be able to set meaningful performance goals because the agency does not know the extent of fraud in any of its programs and that in the future this may have to be factored into goal setting. Written Communication: Mr. Moses almost always prepares written documents that are accurate, objective and complete and he is always mindful of GAO's core values in his products.  He has an excellent command of the language and delivers high quality products on time, even under challenging circumstances.  For example, after completing a very successful pre-message meeting in Los Angeles the EIC went on leave for a week.  Mr. Moses and another staff member were told to have a draft of the product to the Assistant Director before the EIC returned.  Mr. Moses took the lead on this project and the expectation was met with the delivery of an excellent written draft that captured the essence of the pre-message agreement and provided easy reading while comprehensively covering the issues. The Assistant Director was very satified with the product and made compliminary remarks to the EIC about how well it was done.  Mr. Moses was significantly involved in drafting the report.  He was given two major sections, INS information technology and performance measures, to write, neither of which would have been his first choice.  He took these two sections on, however, and did an excellent job. Very few changes were made by the Director and Assistant Director in the two sections. Also, no substantial changes were suggested by the Cold Reader and the editor had complimentary remarks about the overall writing  Mr. Moses assisted with writing other sections of the report including the hook, results in brief and the concluions and recommendations. He and the EIC worked closely together to strengthen all areas in the report. For example, the AD re-wrote the original conclusions but the Director didn't like them.  On his own, Mr. Moses re-worte the conclusion and they were incorporated almost verbatim. Oral Communication:  Mr. Moses almost always speaks confidently, clearly and accurately about the issues with both GAO and agency officials.  In meetings with GAO officials, he listens well and responds appropriately and is always calm and professional, even when there are disagreements.  In the message agreement meeting Mr. Moses confidently responded to questions from the stakeholders and presented options to break impasses.  For example, the Managing Director felt that we were pushing INS to develop outcome measures in our recommendation when we didn't have any suggestions on what should be done.  Mr. Moses responded by stating that INS did not know the extent of fraud in any of its programs but was in the process of validating it in one major program.  Once the extent of fraud is determined, INS could factor this into their performance goals. The Managering Director indicated that this was a good idea.  In meetings with agency officials Mr. Moses handles himself very well.  His thoughts are well organized and he is convincing and very knowledgable about the issues.  Teamwork, Working Relationships, and Equal Opportunity: Mr. Moses is a complete team player and he employs excellent interpersonal skills is dealing with others.  Mr. Moses teamwork and working relationships skills were particularly impressive on this assignment because he was put in a subordinate role where he had not been for the last 25 years. He accepted this role and demonstrated a positive attitude throughout the assignment, working effectively with the EIC and another team member and me.  His interpersonal skills were also strongly demonstrated in working with agency officials.  For example, after talking to Mr. Moses, an INS suboffice is reconsidering opening an investigation into a case that involves more than 500 potential fraudulent applications for benefits from one preparer.  Prior to Mr. Moses' intervention, a service center had been unable to obtain investigative assistance. The suboffice assigned an investigator to the case in September 2001. Mr. Moses believes in fair treatment for all staff and has openly promoted this for many years in his collateral roles as the Los Angeles Office Civil Rights Counselor and Mediator.  He continued his fair treatment of staff on this assignment, promoting good teamwork and equal opportunity.  Staff in the Los Angeles Office and other GAO offices trust Mr. Moses and seek his counsel on both personal and career matters.

October 31, 2001

Ratee Comments: for the rating period 10/1/00 – 9/30/01 (James D. Moses)

I am not a below average performer in the TAJ Group and I was not on the INS benefit fraud assignment. Bonnie Hall is not a below average performer in TAJ and she was not on the same assignment. I don't know how Carla Brown, the third team member, faired.

I received a rating that was signed on 10/18/01 by Rich Stana, Director. Jim Blume, Assistant Director, who prepared the rating did not sign or date it.

The Rating is neither fair nor honest. No expectations were set for me on this job. Jim Blume signed an expectation form dated January 13, 01, but he never discussed with me what my role would be even though there were many opportunities both in person and by telephone. Part B in the rating was prepared by me based on what I felt, with my experience and knowledge, should be expected of me. No one provided feedback to me about my performance on this assignment even though it lasted about a year. There was a big fight between Blume and the EIC over who was going to rate me. Blume insisted that the EIC rate me because he didn't know about the details of my performance on the assignment. The EIC refused to rate me because she it was agreed at the beginning of the assignment that the AD would rate me and he signed the expectation form. This whole thing got out of hand to the point where unpleasant names were uttered. The decision was made that I would prepare my rating with narrative and marks and Blume would sign it. When he received the rating that I prepared, Blume told the EIC that he couldn't go in (to Stana I presume) with a rating that high considering the history. What does history have to do with my performance on this assignment? As my detailed comments I am attaching the two pages of narrative without the marks that I provided to Blume on my performance.

# Defendants' Exhibit 4

# G A O
**Accountability • Integrity • Reliability**

**United States General Accounting Office**
**Washington, DC 20548**

February 27, 2002

Mr. James D. Moses
1662 Cyrene Drive
Carson, CA 90746

Dear Mr. Moses:

This is to acknowledge receipt of the complaint of discrimination that you filed with this Office on January 18, 2002. Based on our review of your complaint and its attachments, the following claims have been accepted for investigation:

- Whether you were discriminated against based on your age (59) when you were rated for the 2000 and 2001 assessment cycles;

- Whether you were retaliated against for intervening in the <u>Chennareddy vs. GAO</u> class complaint when you were rated for the 2000 and 2001 assessment cycles; and

- Whether you were retaliated against for intervening in the <u>Chennareddy vs. GAO</u> class complaint when you were not given a spot award on February 4, 2002.

If you believe we have not correctly identified any issue in your complaint, please provide your specific reasons in writing to this Office within 10 calendar days of receiving this letter.

## Agency Investigation of Accepted Allegation

An independent firm under contract with GAO will investigate the accepted allegations in your complaint and will be in touch with you shortly. When the investigation is completed, we will provide you a copy of the report and an opportunity to comment on it.

## Agency Decision and your Appeal Rights

GAO's Chief Operating Officer, or his designee, will send you a final agency decision, with notice of your appeal rights and the applicable time limits for appeal actions. As outlined in the enclosure, under certain circumstances, prior to receiving the final agency decision, you may file either (1) a civil action in an appropriate U.S. district court or (2) a charge with the General Counsel of the GAO Personnel Appeals Board

(PAB). Either filing terminates this Office's administrative proceedings under GAO Order 2713.2.

If you have any questions regarding the administrative complaint procedures, please contact Allen Elliott or me at (202) 512-6388.

Sincerely,

Ronald A. Stroman, Managing Director
Office of Opportunity and Inclusiveness

Enclosure - GAO Order 2713.2

cc: w/enclosure
    Walter T. Charlton, Esq.
    230 Kirkley Road
    Annapolis, MD  21401

    w/o enclosure
    Norman Rabkin
    Thomas J. Brew
    Margaret Wrightson
    Sally Thompson

Page 2

Defendants' Exhibit 5

**United States General Accounting Office**

# GAO

# Complaint of Discrimination

2006 APR -4 PM 2: 36

For Further Information about the GAO Discrimination Complaint Process see
GAO Order 2713.2.

| 1. Name (last, first, middle initial) | 2. Address (number and street, city, state, and ZIP code) |
|---|---|
| James D. Moses | 1662 Cyrene Dr., Carson, CA 90746 |

| 3. Home Telephone Number | 4. Work Telephone Number | 5. If A GAO Employee | Grade/Band ____ Band II |
|---|---|---|---|
| (310) 762-9006 | (213) 830-1085 | | Position __ Senior Analyst (347) |
| | | | GAO Unit ____ LA/FMA |

| 6. If a GAO Applicant | 7. GAO Unit Alleged To Have Discriminated |
|---|---|
| Position Title/Series _____ | FMA |
| Grade/Band applied for _____ | |

**8. Date On Which Most Recent Alleged Discrimination Occurred** (month, day and year)

During 2000 through 2005

**9. Check the basis(es) on which discrimination is alleged.** (Check all that apply.)

- [✓] Race, If So, Identify Your Race  African American
- [ ] Color, If So, Identify Your Color _____
- [ ] Religion, If So, Identify Your Religion _____
- [ ] National Origion, If So, Identify Your National Origin _____
- [ ] Sex, If So, State Your Sex _____
- [✓] Age, If So, State Your Age  64
- [ ] Disability, If So, State Your Disability _____
- [ ] Retaliation _____

| 10. Has this complaint been discussed with a Civil Rights Complaint Counselor? (Check one.)  [✓] Yes  [ ] No | 11. Counselor's Name  Ms. Dolores Crawford |
|---|---|

| 12. Has the GAO Mediation Program been explained to you as a possible means of resolving your complaint? (Check one.)  [✓] Yes  [ ] No | 13. Date of Initial Contact with Counselor.  2/17/05 | 14. Do you have a representative or legal counselor? (Check one.)  [ ] Yes  [✓] No |
|---|---|---|

| 15. Name of Representative or Legal Counsel. | 16. Address | 17. Telephone Number |
|---|---|---|
| | | |

**18. Briefly describe the alleged discrimination action(s) and the issues in your complaint.** If more space is needed, please use attached continuation page.

I believe I have been discriminated against by Mr. David Walker, Comptroller General, Mr. Gene Dodaro, Chief Operating Officer, Ms. Sallyanne Harper, Chief Administrative Officer, Mr. Jeff Steinhoff, Managing Director, FMA, and FMA Directors when I was placed in Band IIA instead of Band IIB during the recent Band II split because of my race and age.  I Also believe that I was demoted.  The key issues in this complaint are:

**19. What corrective action(s) are you seeking?**

Band IIB and compensation for pain and suffering

| 20. Signature | 21. Date |
|---|---|
| *[signature]* | 3/30/06 |

OPR:ORO

GAO Form 51 (Rev. 10/00)

**18. Description of the Alleged Discrimination Continuation Sheet**

1) Performance appraisals for 2003, 2004, and 2005 were used to determine placement in the Band II split. It is a known fact by GAO Top Management, or it should be, that African American employees at all Band levels received the lowest performance appraisals in comparison to all other groups over the past three appraisal years. 2) The performance appraisal system used is new and had not been validated. 3) The highest rating category in the performance appraisal system is "Role Model". Top Managers in GAO know or should know that African American don't get the Role Model mark as often as other groups. and 4) When GS 13 and 14 were grouped into Band II I felt that my status as a GS-14 was made less important because no distinction was made between the two grades. But when Band II's were recently split into Band IIA and Band IIB distinctions were clearly made. I was placed in Band IIA, a demotion in my mind. Being placed in Band IIA was embarrassing, disrespectful and psychologically draining.

# Defendants' Exhibit 6



**G A O**
Accountability • Integrity • Reliability

United States Government Accountability Office
Washington, DC  20548

Comptroller General
of the United States

February 2, 2006

James Moses
Senior Analyst
FMA
Los Angeles Field Office

Dear Mr. Moses:

This is in response to your request for reconsideration of the decision to place you in
Band IIA instead of Band IIB.  I personally gave serious consideration to your
reconsideration request.  Unfortunately, after detailed review of the statement you
provided and pertinent data, I am unable to grant your request for placement into
Band IIB.  While you are a valued member of GAO and your team, you did not meet
the requirements for strong relative past performance through September 30, 2005.
If you asked for reconsideration of any of the other assessment factors, I did not
consider those because I determined you did not meet the past performance factor.

As I have stated previously, no one in the Band IIA pay range will have his or her pay
reduced as a result of this placement decision.  As a result, you will retain your
current salary and will, at a minimum, be able to earn annual performance based
adjustments up to the maximum Band II rate that was in effect in 2005 (e.g. $118,700
in Washington, D.C.).

GAO will hold another Band IIB placement process in the near future.  This will give
you another opportunity to be considered for possible placement effective as of the
end of June 2006.  In the initial placement process, employees had to meet a high bar
for placement into Band IIB.  In addition to fulfilling the relative performance criteria,
employees needed to have demonstrated that they actually performed the required
roles and responsibilities of a Band IIB to a significant degree and on a recurring
basis through September 30, 2005.  In contrast, future cycles will be competitive and
similar to our current promotion procedures.  The competitive pool will differ from
the pool that was recently considered for Band IIB placement, and an employee's
chances for movement into Band IIB should increase.  In addition, over the coming
months, you should gain further relevant experience which should help improve your
opportunity for Band IIB placement.

The Band IIB placement process was one of the most difficult issues that GAO has undertaken.  The decisions relating to it were not easy, but they were necessary.  I realize that you still may have questions about the process and I am willing to meet with you personally if you would like to discuss this matter.  Please contact Beth Miller, Confidential Assistant, on 512-5500 if you would like to set up an appointment with me regarding my reconsideration decision.

Thank you for your service to GAO, the Congress and our country.

Sincerely yours,

David M. Walker
Comptroller General
of the United States