1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
VENKAREDDY CHENNAREDDY, et al.,         )
                                        )
            Plaintiff,                  )    Civil Action 87-3538 (EGS)
                                        )
        vs.                             )
                                        )
DAVID M.  WALKER,                       )
                                        )
            Defendant.                  )
_____)

Deposition of:

## WILLIAM R.  Mowbray

called for examination by counsel for the Plaintiff pursuant to

notice and agreement of the parties, beginning at approximately

9:30 a.m., on Friday, May 16, 2008, at the offices of Assistant

United States Attorney, 555 Fourth Street, N.W., Washington, D.C.

20530, before Cynthia Thomas, a Notary Public in and for the

District of Columbia, when were present on behalf of the

respective parties:

2

**APPEARANCES**:

       On Behalf of the Plaintiff:

       WALTER T.  CHARLTON, Esquire
       D.C. Bar #186940
       230 Kirkley Road
       Annapolis, Maryland
       Tele: 410-571-8764
       Fax:  410-897-0471
       email: Charltonwt@comcast.net


       On Behalf of the Defendant:

       CHRISTOPHER B. HARDWOOD, Esquire
       Assistant United States Attorney
       555 Fourth Street, N.W.
       Washington, D.C.  20530
       Tele: 202-307-0372
       Fax:  202-514-8780
       email: Harwood@usdoj.gov

Also present:

John A. Bielec, Senior Attorney, GAO
Lincoln Schroth, Senior Attorney, GAO

3

EXAMINATION BY:                                          PAGE

Walter Charlton                                            4

EXHIBITS        TITLE                                    PAGE

    1        Deposition of Mowbray,
              June 27, 2002                                8

    2        Subpoena in Case No.  1:06-01712 JGP         8
              dated 5/31/2007

    3        Subpoena in Case No.  1:87-03538 (EGS)      10
              (DAR) dated 5/1/2008

    4        Mowbray Printouts and Descriptions          35
              (Large brown folder)

   4A(1)     Agency Data Dictionary 08/15/03             39

   4A(2)     MSP Promotion Data                          44

   4B        Mission and Assignment Tracking System
              MATS Users' Manual                         54

    5        Pay for Performance Data                    74

(Exhibits are bound under separate cover due to volume of the same.)

4

1                    **P R O C E E D I N G S**

2                              (Time Noted: 10:27 a.m.)

3     Whereupon,

4                    **WILLIAM R.  MOWBRAY**

5     was called as a witness, and, having been first duly

6     sworn, was examined and testified as follows:

7              MR. HARWOOD:  Let me just state for the

8     record that we are not going to waive signing

9     authority.  We want to read and sign.

10             And it's about 10:27, this deposition was

11    noted for 9:30 and Defendants were here at 9:30.

12             MR. CHARLTON:  I would like to apologize for

13    being late.  We -- I noted to Mr. Harwood that we would

14    have -- we always have difficulty getting in from

15    Annapolis.  Today is a rainy day and we had traffic

16    jams all the way.  Then my two parking lots were full,

17    so I had to walk eight blocks.  I'm happy that my heart

18    held up.  I'll try to make it up on the back end.

19             MR. HARWOOD:  Appreciate it.

20             MR. CHARLTON:  Because I know that time is

21    valued by everybody.  I have a few preliminary

22    questions.

1       **EXAMINATION BY COUNSEL FOR THE PLAINTIFF**

2            BY MR. CHARLTON:

3       Q.  Mr. Mowbray, I'll show you a document and ask

4    you if you recognize it.  This is a printout from -- an

5    electronic printout.  I'm not asking you do you

6    recognize the contents, but, have you ever seen that

7    document?

8            MR. HARWOOD:  Are you marking that as an

9    exhibit?

10           MR. CHARLTON:  Yes, I'm going to mark it as

11   Exhibit No. 1.

12           MR. HARWOOD:  Do you have copies for counsel?

13           MR. CHARLTON:  I do not.  This is the -- I

14   don't plan to refer to it extensively, just the fact of

15   the existence of that document.  I am sure you all have

16   a copy.

17           Now, let's see, that's a 78 page deposition

18   of Mr. Mowbray on June 27, 2002, with attached

19   documents.  That particular copy does not have a waiver

20   of signature and so I really don't know if Mr. Mowbray

21   has ever seen it or not.

22           MR. HARWOOD:  Okay.

23           MR. CHARLTON:  I will ask him though.  It's

24   not a rhetorical question.

25           MR. HARWOOD:  The question is just if you've

26   seen it before?

6

1            THE WITNESS:  Yes, I've seen it before.

2            BY MR. CHARLTON:

3       Q.  Did you go over it at the time as you recall?

4            MR. HARWOOD:  Objection.  What time?

5            BY MR. CHARLTON:

6       Q.  At the time you saw it?

7            MR. HARWOOD:  Objection.

8            THE WITNESS:  I don't think so.

9            BY MR. CHARLTON:

10      Q.  You never read that document; is that what

11  you're saying?

12      A.  No.  I've seen this document.  I was given

13  this document after the deposition, but I'm not sure at

14  what time.

15      Q.  Okay.  Do you recall whether you waived the

16  signature on it or not?  Do you know what I mean by

17  "waiving signature"?

18      A.  No, I don't.

19      Q.  Well, Mr. Harwood just referred to, we're not

20  going to waive signature on this deposition.  And what

21  that means is when the deposition is all done you get

22  to go over it to see if the court reporter made any

23  mistakes and you can correct them.  That's the purpose

24  of the signature at the end.  So I'm asking you, do you

25  recall any such -- about the last page in there will be

26  a place for your signature and there is none.

7

1          A.  I don't --

2              MR. HARWOOD:  There's not a question.

3              BY MR. CHARLTON:

4          Q.  Yeah, there's not a question.

5          A.  I see.

6          Q.  But, the question is, do you recall reading

7     and waiving signature on this?

8          A.  I recall seeing it.  I don't recall waiving

9     signature.

10         Q.  Okay.  At the time that you saw it, was there

11    any -- all right.  At the time that you originally saw

12    that document, did you have any corrections that you

13    can recall at this moment?

14         A.  I don't recall whether I did or not.

15         Q.  Okay.  All right.  I just want to enter this

16    into the record and this is Exhibit No.  1.

17                              [Mowbray Deposition

18                              Exhibit No. 1 was marked

19                              for identification and

20                              made a part of the

21                              record.]

22             MR. CHARLTON:  I have here a copy of a

23    subpoena which I would like marked a as Exhibit No. 2.

24                              [Mowbray Deposition

25                              Exhibit No. 2 was marked

26                              for identification and

1                              made a part of the

2                              record.]

3          MR. HARWOOD:  Do you have a copy of that for

4    counsel?

5          MR. CHARLTON:  I do not.  You may look at it,

6    if you want.  I am not going to have extensive

7    questions about that document either.  It's an old

8    subpoena.

9          MR. HARWOOD:  I would note for the record

10   that the subpoena is not issued in this case.

11         MR. CHARLTON:   It is not issued in this

12   case.  I am showing you Exhibit No. 2 which was a

13   subpoena issued in a case, it was Vant Levin, I

14   believe.  No, in the Moses case approximately a year

15   ago.

16         BY MR. CHARLTON:

17     Q.  My question to you is this, have you ever seen

18   that document?

19     A.  No, I have not.

20     Q.  Well, I represent to you that this was in fact

21   served upon GAO and so the real question is, was it

22   served upon you or not?  And you're saying -- your

23   answer is no; is that correct?

24         MR. HARWOOD:  Objection.  I would object to

25   questions about a subpoena that was issued in another

26   case.  All questions.

9

1          MR. CHARLTON:  Your objection is on the

2     record.  Your objection is noted.

3          THE WITNESS:  What was the question?

4          BY MR. CHARLTON:

5     Q.  The question is, I just want to make sure that

6     your testimony is clear that you have not seen that

7     document?

8     A.  I have not seen that document.

9     Q.  All right.  That's fine.  Thank you.

10         MR. CHARLTON:  Now I want to show you -- this

11    will be No. 3.

12                        [Mowbray Deposition

13                        Exhibit No. 3 was marked

14                        for identification and

15                        made a part of the

16                        record.]

17         BY MR. CHARLTON:

18    Q.  I am now going to show you a document that has

19    been issued in this case, marked Exhibit No. 3.  You

20    want to take a look at it, of course.  Again, this is

21    an electronic printout of what was in fact served.  And

22    this particular document was -- service was accepted by

23    Mr. Harwood who is here today.  And I ask you, have you

24    seen this document, Exhibit No. 3?

25    A.  No, I have not.

26    Q.  All right.  I would ask you to turn to page --

10

1    I don't know what the page number is, but of the

2    attachment to it.  I guess it's the third page of the

3    subpoena which is Attachment No. 1.  I ask you, have

4    you ever seen that page or the information contained in

5    that page?

6          MR. HARWOOD:  Objection.

7          MR. CHARLTON:  What are the grounds?

8          MR. HARWOOD:  The information contained in

9    that page are vague.  We'll have to read the entire --

10         MR. CHARLTON:  He will, perhaps, have to read

11   it.  But I'm asking you -- let me be specific then.

12   Okay.  Withdraw the question and ask another question.

13         BY MR. CHARLTON:

14   Q.  Have you ever seen Attachment No. 1 that

15   appears to be that Attachment No. 1?

16   A.  No.

17         MR. CHARLTON:  Okay.  I want to go off the

18   record.

19         [Discussion held off the record.]

20         MR. CHARLTON:  We can now go back on the

21   record.

22         MR. HARWOOD:  Are we on the record?

23         I'll just say for the record that Exhibit No.

24   3, which is a subpoena that was issued on May 1st,

25   2008, the time for Defendant to respond to that

26   subpoena has not yet lapsed.  At the time that Mr.

1  Charlton and I agreed that we would have the deposition
2  of Mr. Mowbray this day Mr. Charlton had served the
3  notice of deposition to Mr. Mowbray and that notice of
4  deposition contained document requests.  And Mr.
5  Charlton and I agreed that Defendant would do his best
6  to respond to the document requests contained in the
7  notice of deposition and that it has in fact responded
8  to the document request and has produced documents in
9  response to the document request contained in the
10  notice of deposition.
11          Defendant has not yet responded to the
12  subpoena, which when I spoke to Mr. Charlton, he
13  represented that it was largely overlapping and that it
14  would be sufficient for Defendant to respond to the
15  notice of deposition prior to this deposition of Mr.
16  Mowbray.
17          MR. CHARLTON:  All right.  I'm sorry for the
18  confusion and with that explanation I think I know
19  where we are now.  So it appears that we are on track
20  for a later response to the subpoena or some such.  And
21  with that I guess we can proceed.
22          BY MR. CHARLTON:
23  Q.  Now, Mr. Mowbray, as we sit here today, are
24  you aware of any errors of fact or anything else that
25  you might want to correct in your very much earlier
26  deposition regarding the contents and functioning of

12

1    your database system?

2              MR. HARWOOD:  Objection.

3              MR. CHARLTON:  That is -- let me rephrase

4    that.

5              BY MR. CHARLTON:

6         Q.  Do you think that the deposition that you gave

7    earlier was fully complete and truthful insofar as all

8    questions asked to you are correct?

9              MR. HARWOOD:  Objection to the extent of the

10   -- I'll let him answer if he thinks that everything

11   that he said in the deposition before was accurate.

12             BY MR. CHARLTON:

13        Q.  That's the essence of it.

14        A.  I think it was accurate.

15        Q.  Okay.  That's all.

16             Now, I'm going to try to shorten everything

17   down so we get out of here pretty quick today.  I don't

18   want this to drag on.  So I may speak in terms of

19   summary matters just to get a sense of what Mr.

20   Mowbray knows because that's why we're here, to search

21   for truth as to Mowbray's knowledge.

22             Now, if you could summarize for us when you

23   came to work at GAO, under what circumstances and who

24   you reported to.  And start with that as a starting

25   point and give us a brief history of your career before

26   you were actually hired by GAO, and being hired by GAO

1   up to the present time.  I would like specifically for

2   you to mention who your bosses are in the chain of

3   command.

4           MR. HARWOOD:  I'm going to object because you

5   have a lot of information in the question.  If you want

6   him to give you a summary of his work history at GAO,

7   I'm fine with that.  Is that what you are looking for?

8           MR. CHARLTON:  That's what I'm looking for.

9           THE WITNESS:  Just at GAO or prior to?  You

10  said "prior to" also.

11          MR. CHARLTON:  I know because I remember your

12  deposition that I just read again that you worked for

13  IRS to start off with.  But just before -- just before

14  GAO.

15          THE WITNESS:  Just before GAO I worked at

16  GPO.

17          BY MR. CHARLTON:

18      Q.  GPO.  Okay.

19      A.  Correct.  And my boss there was Clyde Meade.

20  And I was -- I'm not sure -- I don't remember my job

21  title.  I worked in quality assurance, quality

22  assurance of printed product.

23          I came to work at GAO in 1985, April of 1985.

24  I worked in what was called a TAG group, a technical

25  assistance group.  I was an operations research

26  analyst, GS-14.  My boss was Barry Snyder.  I worked in

14

1    -- that was the Information Management Technology

2    Group, IMTEC.  I worked there until 1989, November of

3    1989.  I became a data systems analyst in the Office of

4    the Assistant Comptroller General for Operations,

5    ACGOPS.

6        Q.  And who was that?

7        A.  I think the ACGOPS at the time I went to work

8    there was Jim Howard.  But I think I reported directly

9    to John Luke who was the Assistant Comptroller General

10   for Human -- for Human Resources.

11           I have been in that position since.  I am now

12   -- my job series changed to mathematical statistician

13   some years ago, but I am still in the same position.

14   ACGOPS has now become the office known as CAO, Chief

15   Administrative Office.

16       Q.  And who do you report to now?

17       A.  Now, my immediate supervisor is Cheryl

18   Whitaker.

19       Q.  And in between, did you have other

20   supervisors?

21           MR. HARWOOD:  Between when?

22           BY MR. CHARLTON:

23       Q.  In between John Luke and Cheryl Whitaker?  Or,

24   I mean, the last name I recognized or heard you talk

25   about as to who you reported to was John Luke.  I

26   happen to know he's not there anymore.

15

1      A.  Correct.

2      Q.  And for some years he's not been there.  So,

3  was John Luke the last -- did you leave anybody out

4  between Barry Snyder and John Luke in who you reported

5  to?

6      A.  I'm trying to remember.  It's been a while and

7  I'm not -- I don't know of anyone else.  I'm trying to

8  think of who did performance appraisals.  I don't

9  believe there's anyone else.

10      Q.  Are you saying that John Luke did the

11  performance appraisals back then and that's who you

12  reported to?

13      A.  I think so.  I believe so.

14      Q.  And does Cheryl Whitaker do the performance

15  appraisals now and that's who you report to?

16      A.  That's correct.

17      Q.  And there was no one in between?

18          MR. HARWOOD:  Objection.

19          BY MR. CHARLTON:

20      Q.  Was there or was there not someone in between;

21  to the best of your recollection?

22      A.  I'm trying to think and I can't think of any.

23      Q.  All right.  Was there ever a time -- okay.

24  Now, in the chain of command, where do these people fit

25  in terms of the Comptroller General?  That is, he being

26  the boss, under the boss there is AGCs of one kind or

16

1    another and then where does Cheryl Whitaker or John

2    Luke fall?

3        A.  Well, John Luke -- well, organizations have

4    changed over time.  So it's a little hard to be

5    specific.  John Luke reported to -- because he was the

6    Assistant Comptroller General for Human Resources --

7    reported to Joan Dodaro who was the Assistant

8    Comptroller General for Operations.

9        Q.  All right.  There's the Comptroller General.

10       A.  Right.

11       Q.  And then there's Joan Dodaro and then there's

12   John Luke; is that the chain of command?

13       A.  That would have been some years ago, yes, when

14   they were here.

15       Q.  Okay.  Then that changed.  And what happened?

16   What was the change?  What happened next in terms of

17   the chain of command?

18       A.  Well, the chain of command now is Cheryl

19   Whitaker is my immediate supervisor, reports directly

20   to SallyAnne Harper.

21       Q.  Harper is above?

22       A.  Correct; who is the Chief Administrative

23   Officer.

24       Q.  She reports to whom?

25       A.  She reports to the COO, the Chief Operating

26   Officer, who is Gene Dodaro.

17

1        Q.  Now, who is he?

2        A.  Who is now the acting Comptroller General.

3        Q.  And when he was not the Comptroller General

4   before he got to be -- he then reported to the

5   Comptroller General?

6        A.  Exactly.

7        Q.  So, there's -- and that apparently was

8   Comptroller General Gene Dodaro, then Harper, and

9   Whitaker and you.

10       A.  Correct.

11       Q.  And what is -- just so I have this chart

12  right, what is your title now?

13       A.  My title now is mathematical statistician.

14       Q.  And, is it true that you, for this whole time,

15  were the man -- you reported to the person in charge of

16  performance appraisals; is that what you just said a

17  few minutes ago?

18            MR. HARWOOD:  Objection.

19            THE WITNESS:  No.

20            BY MR. CHARLTON:

21       Q.  Would you straighten that out, please?

22       A.  I did not say anything about performance

23  appraisals.

24       Q.  Well, you said something.

25            MR. HARWOOD:  He said that his supervisors

26  did his performance appraisals.

18

```
 1            THE WITNESS:  I was talking about who did my
 2   performance appraisal.
 3            BY MR. CHARLTON:
 4   Q.  Oh, I --
 5   A.  That's how I was identifying supervisors.
 6   Q.  I apologize.  I totally misunderstood that.
 7            Okay.  All right.  Let's get back on the track
 8   here.  So that -- all right.
 9            Now, in between you mentioned Joan Dodarao;
10   about when was that when she was in the chain of
11   command?
12   A.  I think she left GAO roughly, roughly around
13   1999 or 2000.  That's just an approximation.
14   Q.  I understand.  And then when she left
15   SallyAnne Harper came into her slot?
16   A.  That's correct.  Well, not necessarily her
17   slot, because, as I say, organizations changed and it
18   wasn't one structure that never changed where one
19   person simply left and another moved into the chair.
20   But she is now the head of the Chief Administrative
21   Office which is much like the Assistant Comptroller
22   General for Operations Office was when Joan Dodaro
23   occupied it.
24   Q.  I understand.  That's very clear.
25            All right.  Now, if we take what you've said
26   so far, is that a pretty good and substantial summation
```

19

1    of the way the chain of command was during the whole

2    time you were there?

3              MR. HARWOOD:  Objection.

4              BY MR. CHARLTON:

5    Q.  In your judgment.

6    A.  The chain of command to me.

7    Q.  For you.

8    A.  Yes.

9    Q.  Yeah, which one -- I should have said, "for

10   you."  Nothing left out.

11             MR. HARWOOD:  Objection.

12             THE WITNESS:  I think that's reasonable.

13             BY MR. CHARLTON:

14   Q.  All right.  Now, in your prior testimony you

15   talked about the building of the database system, the

16   Bob Mowbray database system.  And my recollection is

17   that you did it retroactively kind of starting in '89

18   or thereabouts and went back and built the files for

19   '86, '87, '88 and forward; is that roughly correct?

20             MR. HARWOOD:  I'm going to object to the term

21   "system".

22             MR. CHARLTON:  Excuse me.  Hold that question

23   for a minute.

24             THE WITNESS: Okay.

25             MR. CHARLTON:  We have an objection from Mr.

26   Harwood here and he objects to my term "system".

1          BY MR. CHARLTON:

2          Q.  I would like you to describe -- do you

3     understand what I'm talking about?  Do you understand

4     the question?

5          A.  I understand what you're talking about.

6          Q.  Then if I'm wrong in any way about a system, I

7     want you to define what it is we're talking about when

8     we talk about what Bob Mowbray does.

9          A.  What we're talking about is a collection of

10    files that I have simply held on -- built and held onto

11    over the course of my employment since the late 1980's

12    in this position.  It's certainly not a system.  Each

13    one -- each file was developed each year independent of

14    others.  They have different variable names, different

15    contents.  They merely are grouped together because

16    they represent certain types of processes.  That is, I

17    created a file in the course of doing my work on pay

18    for performance in 1989.  In 1990 I created a file for

19    -- that represented what went on in 1990.  I made no

20    attempt to have these files be linked, be consistent

21    with one another in terms of contents, in terms of the

22    variables, whatever the variable names are that I

23    created in 1990 may or may not have been consistent

24    with what was there in 1989.  And each year, each

25    succeeding year, when the process came around, I would

26    create a file and at the end of the process I saved

1  that file.  But each of these is an independent

2  creation in that year with different variable names,

3  different contents, and it's in no sense a system.

4  It's a conglomeration of files that are loosely grouped

5  together because they deal with pay for performance,

6  performance appraisals --

7     Q.  Pardon me.  Take this a little slower, will

8  you?

9     A.  They each -- they deal with pay for

10  performance which of course we call PFP.  Appraisals.

11     Q.  Is that performance appraisals?

12     A.  Performance appraisals which were either VARS

13  under that old system or CBPS under the new system.

14  Promotions, that is cycle promotions.  And that was the

15  old MSP system and staffing data, NFC data.

16        Each year I created SAS files as processes

17  took place.  I simply saved those SAS files.  They are

18  not part of a system.  Each requires some in-depth

19  knowledge of what exactly -- what each variable means

20  in each system because I named them and it was

21  developed only for my use.

22     Q.  Did you say that the use of the system

23  requires the knowledge of the variables?

24        MR. HARWOOD:  Objection to the word "system".

25        THE WITNESS:  Use of any of these files --

26        By MR. CHARLTON:

22

1      Q.  Any of these files.

2      A.  -- requires knowledge of the variables.

3      Q.  All right.  I want to stop you there or slow

4  down a bit so we don't get too far away from our

5  understanding of what's going on here.

6           Now, when you say "pay for performance" and

7  you used the term "pay for performance" and you used

8  the term "SAS" files; what is an SAS file?

9      A.  SAS is the statistical analysis system.  It's

10  a programming language and with SAS one can create what

11  are called SAS databases, SAS files, those are

12  synonymous, a SAS file and a SAS database.

13      Q.  So a SAS file is a SAS database?

14      A.  Exactly.  Which can be read using the SAS

15  language.

16      Q.  Now, when you say "pay for performance SAS

17  file" is that all -- I mean, is that one file in SAS

18  language for one year?

19      A.  There would be for 1989 one SAS file

20  representing pay for performance data.

21      Q.  All right.  Now, similarly, when you say

22  "appraisal" for 1989, there would be a SAS file with

23  appraisal data; is that correct?

24      A.  That's correct.

25      Q.  And there would be another SAS file for

26  promotion data?

23

1     A.  Except not in 1989, of course.

2     Q.  Why not?

3     A.  Because there was none created in 1989.  As

4   you know in the previous deposition they were created

5   for 1986, 1987 and then began again in 1990 when I --

6     Q.  So you just -- there was a lapse?

7     A.  That's correct.

8     Q.  So you have 1986, you have 1987, 1988, --

9     A.  No.  No, 1988.

10     Q.  No 1988.

11     A.  '88 and '89 were not collected.

12     Q.  1988 and 1989 were a lapse.  And then you go

13   to 1990; right?

14     A.  Correct.

15     Q.  And so they continue on.  Were there any

16   promotions in those years?

17     A.  In which years?

18     Q.  In 1988 and '89?

19     A.  I would assume so.  I wasn't in the office at

20   that point.  That was before I took the position in

21   November of 1989.

22     Q.  Okay.  So now, just the timing of it is when

23   you took the office you went back and retroactively

24   built these files; is that correct?

25     A.  No, that's not correct.  Not the '86 and '87.

26   Those were created while I was employed with IMTEC.  I

24

1  was detailed or did some work for, I didn't actually

2  change office.  I did some work for the -- for the

3  assistant -- office of the Assistant Comptroller

4  General for Operations specifically to create databases

5  for 1986 and 1987.

6         Q.  And when did you do that?

7         A.  I did that probably in 1988.

8         Q.  Before you came to work for GAO?

9         A.  No, I came to work for GAO in 1985.

10        Q.  1985.

11        A.  I came to work in ACGOPS in 1989.

12        Q.  Oh, I see.  I had those two dates -- that's

13 when you went to GAO in '85 and OPS in 1989.  Okay.

14        But you actually did build '86 and '87 files?

15        A.  That's correct.

16        Q.  Now, going back to the files you mentioned,

17 the NFC data, the staffing data, again, that is an SAS

18 database file?

19        A.  Yes.

20        Q.  All right.  Now, so when you say there is no

21 "system" do you -- do you mean that there is no cross

22 linking between these four types of files?

23             MR. HARWOOD:  Objection.

24             THE WITNESS:  No, that's not what I mean by

25 there's not a system.

26             BY MR. CHARLTON:

1        Q.  Here's what confuses me.  I know that you turn

2   out reports, I've seen some of your reports.  And I

3   know that these reports cross-link these files.  That

4   is correct; is it not?

5        A.  That is correct.  These files can be cross

6   linked through programs.

7        Q.  Yes.  And they all can be cross linked through

8   programming, can they not?

9        A.  Yes.

10       Q.  Now, so what lead me to misspeak, perhaps, and

11  use the word "system" is that I was speaking in viewing

12  the cross linking of these files and the reports that

13  flow from these files as quote, "a system" unquote.

14  And so we have a semantical problem here.  And so I

15  think I'm now starting to understand what you mean.

16            What you're saying is they really are

17  standalone and any report that flows from this I have

18  to program; is that correct?

19       A.  Precisely.  In fact, any report that flows

20  from any one of those I have to program.

21       Q.  All right.  And therefore you do not view it

22  as a system like an off-the-shelf database system that

23  any typist can sit down and do things with?

24            MR. HARWOOD:  Objection.  Do you understand

25  the question?

26            BY MR. CHARLTON:

26

1    Q.  Is that correct?

2    A.  It is -- it is not a system.

3    Q.  Okay.

4    A.  As most people would view a system.

5    Q.  I understand.

6        Now, in an overall sense, is this system the

7    same now as it was when you first built it --

8        MR. HARWOOD:  I'm going to object to the term

9    "system" again.

10       MR. CHARLTON:  -- in that sense.

11       All right.  All right.  I'm sorry.  I've got

12   that embedded in iron in my head and I have to get it

13   out.

14       BY MR. CHARLTON:

15   Q.  Are the programs and the files and the

16   methodology you use to produce reports consistent from

17   1986 to date?

18       MR. HARWOOD:  Object to methodology.  But if

19   you understand you may answer.

20       BY MR. CHARLTON:

21   Q.  And if you want to rephrase that, what I'm

22   trying to find out is, when you first started working

23   on it, you had to do things because the bosses wanted

24   certain reports.  Now the bosses still want reports and

25   you have to do things.  Is there a consistency in your

26   efforts over the flow of time from '86 files through

27

1    2007 files?  Is it all the same or did you put in a

2    whole new system halfway through?

3            MR. HARWOOD:  Objection to "system".

4            MR. CHARLTON:  And my system is -- I mean,

5    did you put in any other methodology all the way

6    through?

7            MR. HARWOOD:  Objection.  I don't understand

8    the question.  I don't know if you understand --

9            MR. CHARLTON:  I don't really want to make a

10   speech here.  I'm just -- we're having trouble

11   conveying this.

12           MR. HARWOOD:  Are you asking him whether the

13   files are available?  The files that were available

14   then?

15           MR. CHARLTON:  No.  I'm not asking him that

16   question.

17           BY MR. CHARLTON:

18       Q.  Are your duties in maintaining these files

19   consistent throughout the time frame?

20           MR. HARWOOD:  Objection.

21           MR. CHARLTON:

22       Q.  Time frame '86 to date.

23           MR. HARWOOD:  Objection to the extent that he

24   has a duty to maintain the files.  I don't think you've

25   made that foundation yet.

26           BY MR. CHARLTON:

28

1        Q.   Do you understand the question?

2        A.   No, I don't.

3        Q.   All right.  When the boss calls for a chart of

4   some kind based upon the data from 1986 in 1987, you

5   had to write a program; right?

6        A.   A SAS program; correct.

7        Q.   If the same boss were here today and asking

8   for the same program in the year 2007, would you still

9   have to write a SAS program?

10       A.   I would still have to write a new SAS program;

11  correct.

12       Q.   Is there any material variation or difference

13  in the level of effort required for you to do that from

14  one year to the next starting in '86 to date or is it

15  roughly the same job?

16       A.   It's difficult to compare years because the

17  level of effort depends on the complexity of what I'm

18  being asked to do.

19       Q.   Assume the task is the same.

20       A.   If the task were the same and the data were

21  the same, then there shouldn't be because SAS is still

22  SAS.  It's the same programming language that it has

23  been since the '80s.

24       Q.   Okay.  Now, if something were to happen to Bob

25  Mowbray, you get run over by a truck tonight –

26       A.   Uh-huh.

1      Q.  -- who would step into your shoes over there?

2           MR. HARWOOD:  Objection.

3           BY MR. CHARLTON:

4      Q.  -- and do that the next time the boss asks the

5  question?

6           MR. HARWOOD:  Objection to the extent you

7  would know.

8           MR. CHARLTON:  Well, there are several

9  answers.  Nobody is one answer.

10          THE WITNESS:  Well, that may well be.

11          MR. CHARLTON:  Is that right?

12          MR. HARWOOD:  Objection.

13          MR. CHARLTON:  What is the objection?

14          MR. HARWOOD:  You didn't ask a question.

15          MR. CHARLTON:  Yes, I did.

16          BY MR. CHARLTON:

17     Q.  Okay.  I think we've gotten to the point where

18  maybe we all understand about the "nonsystem" concept.

19          Now, the data for each one of these years is

20  maintained.  When you crank out the SAS file where is

21  it stored?

22     A.  The data and programs are at the -- on the

23  mainframe computer at the Austin automation center in

24  Austin, Texas.

25     Q.  They're still at Austin.  And are those data

26  and programs still in tact for all of the years here

1   involved '86 through 2007?

2           MR. HARWOOD:  Objection.  He said that there

3   is no data for some of those years.

4           MR. CHARLTON:  I understand that.  But that's

5   not my question.

6           THE WITNESS:  To the extent that I created

7   them, the data is in tact.  Certainly the program --

8   programs have come and gone over the years and have

9   been overwritten and eliminated when I no longer need

10  programs.  Programs are just a means to get to the

11  data.  The data has remained and has been saved.

12      Q.  Okay.

13          [Pause.]

14          BY MR. CHARLTON:

15      Q.  All right.  I want to go over these.  I want

16  to show you what is now --

17          MR. CHARLTON:  We don't have an exhibit

18  number on this, do we?  Here is the package I have

19  gotten for Mr. Harwood.  And I'm going to just make

20  this Exhibit No. 4.  The whole package at the moment.

21  Perhaps we will put subheadings on it as we need.

22                              [Mowbray Deposition

23                              Exhibit No. 4 was marked

24                              for identification and

25                              made a part of the

26                              record.]

1          MR. HARWOOD:  Mr. Mowbray, Walter didn't

2    mention at the beginning of the deposition, but if at

3    any point you need a break just let me know.  If at any

4    point you have a question you don't understand, you can

5    ask him to rephrase it.

6          THE WITNESS:  Okay.

7          MR. CHARLTON:  Now, we have just put a

8    sticker with Exhibit No. 4 on the brown file folder

9    that these items came in.  And I have removed the

10   papers that were in there and I'm going to put them in

11   front of you.  I have not --

12         MR. HARWOOD:  This is not exactly how it was

13   sent to you because Exhibit -- at least I can see that

14   Exhibit A was not in front of my response.

15         MR. CHARLTON:  Well, I don't mean to say that

16   they're untouched by human hands.  So if we can -- what

17   I would like you to do is to put them -- I guess this

18   is perhaps in the proper order now.

19         MR. HARWOOD:  I haven't reviewed it, but

20   counsel has represented --

21         BY MR. CHARLTON:

22    Q.  Have you seen what is now before you as

23   Exhibit A?

24         MR. HARWOOD:  Take a moment to look through

25   this.  It's about a six-inch stack of documents.

26         MR. CHARLTON:  Let's go off the record a

32

1    minute.

2              [Discussion held off the record.]

3              BY MR. CHARLTON:

4        Q.  I'll repeat the last question.  Do you

5    recognize Exhibit A?

6        A.  Yes.

7        Q.  And is it -- are Exhibit A materials that you

8    in fact prepared?

9              MR. HARWOOD:  Walter, we just have to be

10   clear for the record, you've marked everything Exhibit

11   4 and it's probably not going to be very clear what

12   this is.

13             MR. CHARLTON:  All right.  We're talking

14   about Exhibit A part of Exhibit 4.

15             THE WITNESS:  Now, actually, I provided only

16   a part of Exhibit -- well, there's an Exhibit A and an

17   Exhibit B here.

18             BY MR. CHARLTON:

19       Q.  We are only talking about Exhibit A at the

20   moment.

21       A.  Okay.  Got it.

22             THE WITNESS: [Examines the document.]

23             Okay.  Yes, Exhibit A out of the box.

24             BY MR. CHARLTON:

25       Q.  And we'll come back to Exhibit A in a minute.

26   Now, Exhibit B, did you provide Exhibit B?

33

1          A.  No, I did not.

2          Q.  You had nothing to do with Exhibit B?

3          A.  No.

4          Q.  All right.

5          A.  Let me make sure what's in here.  Just one

6     second.

7               MR. HARWOOD:  Walter, are you asking specific

8     questions about documents in Exhibit A?

9               MR. CHARLTON:  Not yet.  I'm going to --

10              MR. HARWOOD:  When you do, I would like you

11    to provide copies for us.

12              MR. CHARLTON:  Well, I don't have copies.

13    This is all I have and we'll just have to do the best

14    we can with it.  This came from you, so I presumed you

15    had a copy.  I have not changed any pages or added any

16    pages, subtracted any pages.  So, it's what I got from

17    you.  We'll just have to do the best we can.  I don't

18    know whether I'll be asking detailed questions about it

19    yet or not.

20              BY MR. CHARLTON:

21         Q.  But right now my question is, or the last

22    question was, did you have anything to do with

23    preparation of Exhibit B?

24         A.  And I did supply, I believe, the very last

25    clip, the small clip, this one, of Exhibit B.

26         Q.  All right.  Let's remove that from Exhibit B

1   then and take a look at it.

2           MR. HARWOOD:  Walter, I think you should mark

3   some of these exhibits specifically otherwise we're

4   going to have no idea what --

5           MR. CHARLTON:  I will do that at the proper

6   time.  And I guess the proper time is now.

7           Let's mark this one B(1); 4B(1).  It should

8   be 4B(1).

9           MR. HARWOOD:  4B(1) would make more sense.

10                          [Mowbray Deposition

11                          Exhibit No. 4A(1) was

12                          marked for identification

13                          and made a part of the

14                          record.]

15          BY MR. CHARLTON:

16      Q.  Okay.  I show you what's been marked as

17  Exhibit 4B(1) which would appear to be the final 15 or

18  20 pages of the response to production of documents

19  which is marked as Exhibit B, and ask you if you can

20  identify that document?

21      A.  Yes, this is a data dictionary for the MATS

22  system which is the Mission Assignment and Tracking

23  System.  It's a system to which many people in GAO have

24  access.  It's where information is stored on job

25  assignments, hours charged to jobs, risk level of jobs

26  and timing of jobs, dates, who the requesters are, just

1   all information in tracking of jobs in GAO.

2           MR. HARWOOD:  I would just note for the

3   record that Exhibit -- what has been marked as Exhibit

4   4B(1) was actually produced in response as part of

5   Exhibit A to Defendant's response to document requests

6   contained in Plaintiff's notice of deposition of

7   William R. Mowbray.  So Walter, this was actually

8   attached to Exhibit A.

9           MR. CHARLTON:  Is a part of Exhibit A.

10          MR. HARWOOD:  Yes.

11          MR. CHARLTON:  Okay.  Well then let's --

12   right now, let's just change the designation because I

13   thought it was part of Exhibit B.  So let's change the

14   table on that.

15          MR. HARWOOD:  Why don't we make it 4A(1).

16          MR. CHARLTON:  4A(1).  Thank you for catching

17   that.

18          MR. HARWOOD:  Let's go off the record for one

19   second.  I'm going to get my set of these.

20          MR. CHARLTON:  Okay.

21          [Discussion held off the record.]

22          BY MR. CHARLTON:

23       Q.   All right.  I am now showing you revised

24   Exhibit tab number 4A(1).  And as we now understand

25   that was a part of the submission on Exhibit A.  And

26   did you actually physically prepare that document?

36

1     A.  No, I did not.

2     Q.  Who did?

3     A.  I obtained that from a man by the name of

4  Mario Petrucelli in the office of QCI which is Quality

5  and Continuous Improvement.

6     Q.  And he gave it to you.  Why did he give it to

7  you?

8     A.  I asked him for it.

9     Q.  And why did you ask him for it?  Did you see

10  that that was in response to one of our requests?

11     A.  Yes, because this is a JAOI database to which

12  I have access.

13     Q.  Okay.  So what we're looking at here is a

14  database?

15     A.  This is indeed a database.

16     Q.  And that's in a database system?

17        MR. HARWOOD:  Objection.

18        THE WITNESS:  I don't know if I would call it

19  a database system.  MATS is the mission assignment and

20  tracking system, as far as I know.

21        BY MR. CHARLTON:

22     Q.  Okay.  You have access to it.  Do you use it

23  at all?

24     A.  Very seldom.  It's a very large system and I

25  have very little use for the data.

26     Q.  All right.  A glance at that page appears to

37

1   be -- appears to contain -- the pages appear to contain

2   some kind of a code for various fields and field

3   descriptions; is that correct?

4       A.   That's correct.

5       Q.   Are those field descriptions the same,

6   different, or mixed in comparison to your field

7   descriptions?

8            MR. HARWOOD:  Objection.

9            THE WITNESS:  I have no field descriptions

10  for my files.

11           BY MR. CHARLTON:

12      Q.   That is, there's no resemblance, whatever, to

13  these?

14           MR. HARWOOD:  Objection.

15           BY MR. CHARLTON:

16      Q.   Since you have none and there's something

17  here.

18           MR. HARWOOD:  Same objection.

19           THE WITNESS:  This is a data dictionary.  I

20  have no data dictionary for any of my files.  My files

21  are not part of a system.

22           BY MR. CHARLTON:

23      Q.   They're just files.

24      A.   They're just files.

25      Q.   All right.  Now, if we were to take -- jumping

26  now away from this item here back to A --

1          [Pause.]

2          BY MR. CHARLTON:

3     Q.  One of those Exhibit A pages, MSP promotion

4  data, would you go to that --

5     A.  I have it.

6     Q.  -- page.  What are the variables in that --

7          MR. HARWOOD:  Do you want to mark that?

8          BY MR. CHARLTON:

9     Q.  -- file?

10         MR. CHARLTON:  Pardon?

11         MR. HARWOOD:  Do you want to mark that?

12         THE WITNESS:  Just the first one?

13         MR. CHARLTON:  No, I don't think we need to

14  mark it.  Do we have page numbers or anything on this?

15         THE WITNESS:  The first one doesn't appear

16  to, but I think the rest do.  Maybe Xeroxed off.

17         MR. HARWOOD:  I think you should mark it,

18  Walter.

19         MR. CHARLTON:  Well, let's mark that page --

20  just mark it page 1 and then we don't need to mark it.

21  It's just -- where are we anyway?  This is part of --

22  let's call that Exhibit 4A(2).

23         MR. HARWOOD:  4A(2).

24         MR. CHARLTON:  Right.  That's a good idea.

25  This whole package.

26                                   [Mowbray Deposition

1                    Exhibit No. 4A(2) was

2                    marked for identification

3                    and made a part of the

4                    record.]

5          MR. CHARLTON:  All right.  Let's start over.

6    I'm going to put a -- with the agreement of counsel I'm

7    going to put a "page 1" on page 1 is that all right?

8          MR. HARWOOD:  That's fine.

9          MR. CHARLTON:  All right.

10          BY MR. CHARLTON:

11      Q.  I am showing you what has been marked Exhibit

12    4A(2), pages 1 through 14.  And I ask you, what is

13    that?  What are those 14 pages?

14      A.  These are the 14 pages that represents one of

15    the MSP files starting with '86 and '87 and then

16    picking up with 1990 and running up through 2001.  So

17    each represents the file that I saved representing the

18    promotion processes for those years.

19      Q.  And so there's 14 pages representing 14 files

20    in 14 different years?

21      A.  That's correct.

22      Q.  Now, can you take -- I am not asking you to do

23    this, but I'm asking you, is this possible.  Can you

24    take each one of those 14 pages and describe what each

25    field on those 14 pages consists of, a description of

26    it?  Are you able to do that?

1        A.  I'm not able to do it without actually looking

2   at the data.  I can look because I'm the creator of

3   these files.  I can look at these variable names and

4   make a pretty good guess as to what many of them stand

5   for.  In other cases I don't know and one way to find

6   out if I have to do an analysis on an old data set, I

7   have to go in the data set and maybe do a frequency

8   distribution or something on the data that's in there.

9   And then the light may come on and I'll say, oh, yes, I

10  remember why I named that a certain thing.  These are

11  just the variable names that I attached to the data in

12  the year in which I created these files.

13       Q.  For the purposes you were working with at that

14  time?

15       A.  Exactly.

16       Q.  Okay.  So what you're saying is, the data is

17  there for each one of these data fields, but the system

18  description is not there it's only in your head and it

19  isn't even in your head until you put it there by

20  looking at data which allows you to recall what it

21  really is?

22            MR. HARWOOD:  Objection.

23            MR. CHARLTON:  Is that roughly correct?

24            MR. HARWOOD:  I'm not sure that's answerable.

25            MR. CHARLTON:  No?

26            MR. HARWOOD:  But if you can put it in your

41

1      own words, then maybe you could answer.

2               BY MR. CHARLTON:

3         Q.  Then, please, would you describe?  What I'm

4      trying to do is avoid asking this question.  Here's the

5      question then.  Can you provide a description of the

6      format and the usage for each of the variables listed

7      on each of the pages?

8               MR. HARWOOD:  Could you repeat the question?

9               BY MR. CHARLTON:

10        Q.  Provide a description of the format and usage

11     for each of the variables listed on each of the pages.

12              MR. HARWOOD:  I'm going to object to "usage."

13     I don't understand the question, but if you can answer,

14     you can answer.

15              MR. CHARLTON:  Well, usage or meaning.

16              MR. HARWOOD:  I still would object.

17              THE WITNESS: I could -- I, with a great deal

18     of work, could do that for a larger number of the

19     variables.  I certainly couldn't guarantee that

20     everything that exists in there I recall what it means.

21              BY MR. CHARLTON:

22        Q.  Okay.  And how many fields are in each one of

23     those products?

24        A.  They vary.  As we can see they vary.  I'm not

25     counting, I'm only looking.  I see two and a half lines

26     of data for the first file.  Only two lines by the time

42

1    I get to page 5.  Four lines by the time I get to six.

2    So there are different numbers of variables in each --

3    in each one.

4        Q.  In different years.

5        A.  And they vary.

6        Q.  In each year; correct?

7        A.  Right.

8        Q.  And this situation applies to the promotion

9    data, the pay for performance data, the pay for

10   performance appraisal data and the MSP pay for NFC

11   data; is that right?

12       A.  For what situation?

13       Q.  The same.  That is, the only way to pull out

14   the meaning of the variables is for you to go through

15   with a great deal of work and find out what they are.

16           MR. HARWOOD:  Objection.  That's now what he

17   said.

18           THE WITNESS:  No.

19           BY MR. CHARLTON:

20       Q.  Well, would you clarify what you said?

21       A.  What I said are -- is that in some cases

22   that's what would be necessary if it's something I

23   don't recognize.  Obviously if I were to look at

24   something like "EL name" that is clearly the employee's

25   last name.  I don't need to go in and look at the

26   database to know that.  "Eseries" is the employee's

43

1    series.  I don't need the database for that.  "Rating"

2    is either BQ or Q.  I don't need to go in and look at

3    that.  But if I look at something like "ANNCAT" I'm not

4    sure what I meant by that, that year.  I'd have to go

5    in and look at that and all the data in that field and

6    find out just what is "ANNCAT" telling me in that year

7    in order to figure that out.

8        Q.  Okay.  I want to ask you some questions about

9    the data variables to see whether you can identify them

10   or not.

11            MR. HARWOOD:  And are these questions

12   specific to the MSP exhibit?

13            MR. CHARLTON:  Maybe.  Maybe not.  I don't

14   know where he's got them.  That's one of the problems.

15   That's a good question you're asking.  I don't know the

16   answer to it.

17            MR. HARWOOD:  I just want to make sure if he

18   has to refer to another exhibit --

19            MR. CHARLTON:  I don't know.

20            MR. HARWOOD:  -- to make sure that you let

21   him.

22            MR. CHARLTON:  Let's forget about the

23   exhibits for a minute and just ask.

24            BY MR. CHARLTON:

25       Q.  In all of the files that you maintain, do you

26   have a field somewhere or another that does these

44

1   things that I'm getting ready to ask you.  You can say

2   yes or no or I don't know.

3       A.  I think you may be overly broad there.  I

4   can't guarantee for any given variable that it exists

5   in all files that I maintained.

6       Q.  Okay.

7           MR. HARWOOD:  Walter, just before you ask the

8   question, can you -- you're using the word "field" he's

9   using the word "variable" can you just make sure that

10  you understand --

11          MR. CHARLTON:  That's synonymous.  I'm taking

12  about a field -- I presume they're a fixed-length

13  field.

14          THE WITNESS:  They are before they go into

15  SAS format; yes.

16          BY MR. CHARLTON:

17      Q.  And in SAS format they are not a fixed-length

18  field?

19      A.  No.  Well, they're in the SAS database.

20      Q.  The SAS database.  Okay.  So these fields

21  here, are they before they go into the SAS format or

22  after?

23      A.  These are SAS.

24      Q.  They are the output.  They're the SAS data

25  output.  Okay.

26      A.  They came from variables.

1      Q.   Whatever they are, they're a field?

2      A.   Correct.

3      Q.   Okay.  All right.  So, what we are talking

4   about here is, for each one of these files that you

5   maintained, you have them separated the way you've

6   explained they're separated.  And you have a field

7   within that file for data.  And now I'm going to ask

8   you about whether you have this specific data or not.

9   And when I say "or not" whether you have the data or

10  not, I mean, ever.  Ever in any one of the years.  Then

11  if -- and then the next question is going to be, if we

12  get that far, if the data is there sometimes is it

13  there all the time?  That's a different question.

14          I just want to know, do you have the data

15  sometimes?  Because I'm trying to get an understanding

16  of what's going on here.

17          Okay.  And here are the data fields.

18          MR. HARWOOD:  I'm going to object to the

19  question.

20          MR. CHARLTON:  Okay.

21          MR. HARWOOD:  I think that it's vague.  But

22  to the extent that you can answer, you can answer it.

23          THE WITNESS:  Well, I see you have a fairly

24  long list and there are only a handful of things that I

25  know I could say are going to be consistently in all 77

26  files that we're talking about here.

46

1          BY MR. CHARLTON:

2      Q.  All right.  Well, let's start with -- start

3  with -- tell me what you know is in there.

4      A.  Well, they all contain Social Security

5  Numbers.

6      Q.  Okay.  Next.

7      A.  Let me make sure I know the major --

8          MR. HARWOOD:  If he needs to look at the

9  documents, make sure you look at them.

10         THE WITNESS:  But the thing is, I can't

11  remember all 77.

12         MR. HARWOOD:  If you can't answer without

13  looking at all 77, then you can't answer without

14  looking at all 77.  Don't guess.

15         THE WITNESS:  Well, I think we may have

16  almost run out of what we know is in all of them.

17  Because I think perhaps race is in all of them and

18  gender.  And I believe that's probably it.  Because if

19  we look at NFC data from 1989, there are only one, two,

20  three, four, five, six, seven, eight, nine, ten, 11, 12

21  variables in the entire file.

22         BY MR. CHARLTON:

23     Q.  And what is NFC data?

24     A.  This is the staffing data from National

25  Finance Center.

26     Q.  All right.  Let's start with that one, can you

47

1   tell us what each one of those variables are?

2           MR. HARWOOD:  Why don't we mark that as an

3   exhibit?

4           MR. CHARLTON:  Now, let's mark this as

5   exhibit -- what is the next exhibit number?

6           MR. HARWOOD:  4A(3).

7           MR. CHARLTON:  Thank you.  4A(3), madam

8   reporter.

9                              [Mowbray Deposition

10                             Exhibit No. 4B was marked

11                             for identification and

12                             made a part of the

13                             record.]

14          THE WITNESS:  All right.  The data elements

15  are "DOB" which would be date of birth.

16          BY MR. CHARLTON:

17     Q.   Stop.  If you have the date of birth, how can

18  you say you don't have it?  You don't have age, I don't

19  get it.

20          MR. HARWOOD:  Objection.  That's not a

21  question.

22          MR. CHARLTON:  Huh?  Well, you confused me

23  with your previous answer.  You said, all files contain

24  the Social Security Number, the race, and the gender,

25  at least.

26          MR. HARWOOD:  He didn't say they all

1    contained the Social Security Number.  He said that he

2    believed they all contained the race and the gender.

3    He didn't say they definitely contained the race and

4    the gender.

5        MR. CHARLTON:  I think he did.  I don't want

6    to argue, that's for the witness, not us.

7        THE WITNESS:  No, I said, I can't absolutely

8    guarantee that something is in all 77 files.

9        BY MR. CHARLTON:

10    Q.  Well, if you --

11    A.  It's likely that date of birth is also in all

12    of them.

13    Q.  Okay.  That's okay.  That's fine.  Now I'm not

14    confused anymore.  Next.

15        MR. HARWOOD:  Do you want to go back to

16    reading off the variables from the NFC data?

17        MR. CHARLTON:  Yes.

18        THE WITNESS:  Okay.

19        MR. HARWOOD:  For the first year of the NFC

20    data?

21        MR. SCHROTH:  Just, I want to clarify, it's

22    Exhibit 4A(3) and we're only talking about I think it's

23    page 59 in the top right corner.  Is that the only page

24    we're discussing this morning?

25        MR. CHARLTON:  Correct.

26        THE WITNESS:  That's right.

49

1          MR. HARWOOD:  And what year is that?

2          THE WITNESS:  This is June of 1989.

3          BY MR. CHARLTON:

4     Q.  And it's 4A(3), what was that page number

5     again?

6          MR. HARWOOD:  Page 59.

7          MR. CHARLTON:  Okay.

8          MR. HARWOOD:  And the date is June 1989 --

9     well, 1989 data.

10          BY MR. CHARLTON:

11     Q.  Now, you were going to tell us the data

12     elements that are in there.

13     A.  All right.  The second one is educational

14     level.  This is a two-digit code indicating level of

15     education.  A 13 means a bachelors degree, for example.

16     Q.  Okay.  I don't want you to go that far.

17     Educational level.  Now, again, so we understand each

18     other, are you saying that you have educational level

19     for everybody or not?

20          MR. HARWOOD:  Objection.

21          THE WITNESS:  I don't know.

22          BY MR. CHARLTON:

23     Q.  But that's what that field means?

24     A.  That's what it means in this database, yes, or

25     in this file, yes.  And I would have to go through 77

26     of these to confirm that it's indeed in all of them.

50

1     Q.  Okay.  And I understand what you're saying

2  about that one.  Now, where do you get the number 77

3  from?

4     A.  There are 77 pages in this, if we go from the

5  front to the back, this is the final one.  This is the

6  77 page --

7     Q.  All right.  Let me rephrase.  We're on the

8  wrong track here.  All right.  I need a minute.

9          MR. CHARLTON:  Let's go off the record just

10  for about 30 seconds.

11          [Discussion held off the record.]

12          BY MR. CHARLTON:

13     Q.  All right.  Cancel that discussion for a

14  minute.  Let's go back a minute.  As I understood your

15  prior testimony, you said I have four sets of files.

16     A.  Four groupings, yes.

17     Q.  Four groupings of files.  And you then said

18  that -- I was attempting to find out what information

19  you have for each person in these files.  And you said

20  roughly that the only thing I can guarantee is Social

21  Security, race, gender, and date of birth.

22          MR. HARWOOD:  Objection to the

23  characterization --

24          MR. CHARLTON:  Okay.  This is just

25  background.

26          BY MR. CHARLTON:

51

1      Q.  Now, the next thing that confuses me is this,

2  you have, as I understand your testimony, 77 pages for

3  each year; is that right?

4          MR. HARWOOD:  Objection.

5          THE WITNESS:  No.

6          BY MR. CHARLTON:

7      Q.  No, excuse me.  You have -- is it four pages

8  for each year then?  Four groupings?

9          MR. HARWOOD:  Objection.

10         BY MR. CHARLTON:

11     Q.  Four sets of files.  For each year how many

12  sets of files do you have?

13         MR. HARWOOD:  Objection.  He hasn't looked

14  through for each year.  You have to look through each

15  year --

16         MR. CHARLTON:  Chris, please, don't

17  interrupt.  You can object, but I'm asking him, not

18  you.

19         THE WITNESS:  For most years that we're

20  talking about, obviously not for '86 and '87.  But for

21  the years since 1990 we're talking roughly in almost

22  all cases four per year.  One for pay for performance,

23  one for appraisals, one for MSP promotions, and one for

24  NFC data.

25         BY MR. CHARLTON:

26     Q.  Okay.  Now, in each one of these sets of files

52

1  you have a person identifier, i.e., the Social Security

2  Number --

3       A.  Correct.

4       Q.  -- is that correct?

5       A.  That's correct.

6       Q.  Now, I'm not attempting to ask you whether you

7  have the education level in each one of those four sets

8  of data.  What I want to know is, do you have the

9  education level in one of the sets of data, any one of

10 the sets of data?

11      A.  Again, without reviewing each of the four sets

12 for all the years, I can't categorically say yes or no.

13      Q.  I understand.  I understand that that is true.

14 But for this year -- now we're talking about for the

15 year, what is it, '86, that you have in front of you?

16      A.  You don't want to do '89 because there isn't

17 an MSP for '89.

18      Q.  All right.  Well, pick out a year that's got

19 an MSP for '89.

20      A.  All right.   Let's go to --

21      Q.  I mean --

22      A.  Let's go to 1990 in all cases.

23      Q.  That's what we want to do.

24      A.  There's a 1990 in every case.

25          MR. CHARLTON:  Let's mark that -- get the

26 1990s.

53

1          MR. HARWOOD:  Why don't you finish marking

2     each of the four categories?

3          MR. CHARLTON:  No, I don't want to do that.

4     We probably should, but let's just mark this.  Let's

5     get 1990 together and mark it as the next -- have you

6     got 1990 together?

7          MR. HARWOOD:  You're going to have to pull

8     pages out of current exhibits.

9          THE WITNESS:  Yeah, I just turned to the page

10    and laid them out.

11         MR. CHARLTON:  All right.  I would like you

12    -- let me ask you to do something different.  Pull 1990

13    out of the four sets and put them all together.

14         I guarantee you we are not going through all

15    77 pages.  So I don't even care if it gets scrambled at

16    this point.

17         THE WITNESS:  Okay.  Got it.

18         BY MR. CHARLTON:

19    Q.  Okay.  Now, I think -- let's start over with

20    1990.  Going back to my first question, my first

21    logical question on this thing.  Each set or I'd prefer

22    to call them a set.  What did you call them?  Group?

23    Each grouping of files, that is the four groupings for

24    1990, have in each of the files a Social Security

25    Number; is that correct?

26    A.  That's correct.

54

1          Q.  Now, for 1990 I want to ask you whether you

2    have files in there for -- somewhere for race.  I think

3    you said, yes.

4          A.  Well, let me look.

5               MR. HARWOOD:  And you're asking him if this

6    appears in any one of the four?

7               MR. CHARLTON:  Any one of the four sets.

8               THE WITNESS:  In any one of the four.  All

9    right.  That's easier.  Yes.

10               BY MR. CHARLTON:

11          Q.  The answer is yes?

12          A.  Yes.

13          Q.  Okay.  Race, gender.

14          A.  Yes.

15          Q.  Date of birth?

16          A.  Yes.

17          Q.  Education level?

18          A.  Yes.

19          Q.  I'm going to ask you some more questions.

20    Whether or not applied for a promotion?

21          A.  There's not a field for whether applied for a

22    promotion.  The -- yeah, there's no field in any of

23    these for applied for a promotion.  However, existence

24    in this data set MSP 90 means applied for a promotion.

25          Q.  So that can be -- that's a yes assumed; right?

26               MR. HARWOOD:  Objection.

55

1          BY MR. CHARLTON:

2          Q.  Is that correct, Mr. Mowbray?  By its

3  existence there it means either applied or was

4  automatically eligible?

5          A.  Yes.

6          Q.  Next.  Whether or not a person made the best

7  qualified list?

8          A.  Yes.

9          Q.  Whether or not a person was promoted or not?

10         A.  Yes, it indicates whether they were promoted

11  in the cycle of promotion.  There are no --

12         Q.  Now, what I --

13         A.  -- cycle.

14         Q.  Okay.  So it's a yes with a question mark.

15  And I want to stop and talk about this one a little

16  bit.  Because we got -- and we have to mathematically

17  define what we are talking about here so we're clear.

18  And I'm relying on you to straighten it out.

19          You have a cycle and when does the cycle

20  begin and end each year at GAO -- the promotion cycle.

21         A.  They ended -- the cycles changed and I'm

22  trying to remember when.  Right now the cycles run from

23  the appraisal cycles, the rating cycles run from

24  October to October.

25         Q.  All right.  Now, I don't want to hold you to

26  this, but for purposes of this discussion and

56

1    understanding it, I want to make the assumption that

2    all the cycles for all the years are the same and

3    they're October to October.  That's okay.  Because when

4    there are variations, if we ever get into the

5    intricacies of this we'll fix that.

6             MR. HARWOOD:  I'm going to object to that.

7    You have to answer the question --

8             [Simultaneous conversation.]

9             MR. CHARLTON:  Is that -- so that you and I

10   communicate, I want to make that assumption; is that a

11   fair assumption.

12            MR. HARWOOD:  I'm going to make my objection

13   for the record.  I object to that to the extent that

14   you're asking him to assume something that's not true.

15   He's here to answer your questions to the best of his

16   ability and he's going to answer them to the best of

17   his ability.  He's not going to assume something that

18   he knows is not true or that he doesn't know.

19            MR. CHARLTON:  Your objection is on the

20   record.

21            BY MR. CHARLTON:

22       Q.  Now, do you understand where I'm trying to get

23   to with this?

24       A.  Not yet.

25       Q.  All right.  I want you to assume that the

26   promotion cycle is October to October.

57

1          MR. HARWOOD:  I'm going to object to that.

2          BY MR. CHARLTON:

3      Q.  I then am asking you this question:  I'm

4  looking at a database, I don't care which year it is,

5  where the promotion cycle is October to October.  And

6  I'm asking you the question, in this promotion cycle

7  was this Social Security Number guy promoted or not?

8  Now, we've got a problem because the promotion cycle

9  might be here and the promotion might come into the

10  next year.  Now, I don't know how you record that.  And

11  I'm asking you this question, how do you handle that

12  problem in your database?

13          MR. HARWOOD:  Objection.  You can answer.

14          MR. CHARLTON:  Or is it a problem that

15  doesn't exist?

16          MR. HARWOOD:  If you don't understand, make

17  him rephrase it.

18          THE WITNESS:  Could you rephrase?

19          BY MR. CHARLTON:

20      Q.  I'll try.  Let me start with a different

21  question.  The question -- we're starting with the

22  question, does your data contain whether a person was

23  promoted or not?  And you said, yes, with a caveat of

24  some kind.  And I would like you to explain the caveat.

25  Explain why you say yes.

26      A.  It's whether the person was promoted in the

58

1    annual assessment and promotion cycle.  There are

2    occasionally out-of-cycle promotions.  I don't capture

3    those.  I capture only the cycle that takes place when

4    vacancies are announced, people apply, panels meet,

5    they BQ people and then eventually people are selected.

6    Those are the cycle appraisals and that's what I've

7    captured.

8        Q.  That's very clear.  Fine, thank you.  I have

9    this question.  If we are talking about a cycle, a big

10   cycle, October to October, February to February, I

11   don't care when it is, does the promotion occur within

12   that cycle that you record or in the first of the next

13   one?

14       A.  No, it does not.

15       Q.  When does it occur?

16       A.  Well, think of the current time which is

17   easier to think of rather than back when I don't know

18   what the cycle times were.  Right now the ratings cycle

19   is from October to October.

20       Q.  Yes.

21       A.  So at the beginning of October each person

22   gets a rating, an appraisal.  Then some period of time

23   passes during which -- during which they can apply for

24   a promotion and so forth.  So the people who got their

25   ratings last October in '07 would have applied over the

26   course of the winter and the promotions were just

59

1   effective in either February or March of that is year.

2       Q.  So there's --

3       A.  So the promotions are effective well after the

4   appraisal period.

5       Q.  Okay.  Thank you.  That's very clear.

6           So your answer is whether or not a person is

7   promoted or not is captured in your data?

8           MR. HARWOOD:  Objection.  The answer is what

9   it is.

10          BY MR. CHARLTON:

11      Q.  Yes?  And that is your -

12      A.  It is one of those variables in that cycle.

13      Q.  And which variable is that?

14      A.  In this particular one it's called select, S-

15  E-L-E-C-T.

16      Q.  Okay.

17          MR. HARWOOD:  Why don't you identify which

18  particular one you were pointing to.

19          THE WITNESS:  Well, for the 1990 MSP --

20          BY MR. CHARLTON:

21      Q.  Database.

22      A.  MSP 90.

23      Q.  It's select, quote "S-E-L-E-C-T"?

24      A.  Correct.  And that may have values depending

25  on year ranging from Y and N for yes and no S and N for

26  yes and no.  It may have W for withdrawal.

60

1      Q.  Okay.

2      A.  It may have --

3      Q.  I understand.

4      A.  -- D for declined.

5      Q.  Understood.  Okay.  Next I want to go to the

6  next item.  Performance rating.

7      A.  And we're still operating under the question,

8  does it occur in any of these four --

9      Q.  Yes.

10      A.  -- databases?

11          The 1990 VARS rating is in one of the

12  databases.

13      Q.  The answer is yes; right?

14      A.  Correct.

15      Q.  We've already handled age.  We've handled

16  race.  We've handled gender.  The next one is

17  specialist or not.

18      A.  For this particular year do you mean the

19  position as a specialist position or the employee who

20  is applying is a specialist?

21      Q.  No.  No.  No, I'm not asking that question.

22  Let me -- it has gotten untracked here.  I am asking

23  about an individual whose Social Security Number

24  appears and the question is, is this guy a specialist

25  or not?

26      A.  That is, it's not a field in there.  The field

1   is series and whether the person is -- if the person is

2   in series 0347, then they are not a specialist, and

3   everything else is considered --

4        Q.  All right.  So information is in there?

5        A.  Yeah.

6        Q.  Is determinable?  Yes.  Okay.

7            Disabled?

8        A.  There is a disability code, a two-digit code

9   in there.  Yes.

10       Q.  Veteran?

11       A.  No.

12       Q.  Not in there?

13       A.  Not in any one of them.

14       Q.  Disabled veteran?

15       A.  Well, clearly not.

16       Q.  Okay.  Now, as to veterans, do you have access

17  to veteran information anywhere?

18       A.  I do now.

19       Q.  And when did you become -- you say "now" when

20  did it start?  Are you implying that you didn't before?

21           MR. HARWOOD:  Objection.

22           THE WITNESS:  At the time in the 1990s

23  whenever the database was created, that was not one of

24  the fields that I was receiving when I received my

25  information from the NFC system.  I get it downloaded

26  from the Human Capital Office and given to me.  I was

1   not at that time receiving veterans preference as one

2   of the fields.  It was a field that was available.  It

3   simply wasn't one I was receiving at that time.

4           BY MR. CHARLTON:

5   Q.  That you didn't capture?

6   A.  Somewhere in the '90s we started capturing it.

7   Q.  Do you know from collateral knowledge whether

8   or not GAO has records anywhere of the status of folks

9   -- veterans, non-veterans, disabled veterans?

10          MR. HARWOOD:  Objection.

11          BY MR. CHARLTON:

12  Q.  They must.

13  A.  At what time?

14          MR. HARWOOD:  Objection.

15          BY MR. CHARLTON:

16  Q.  Ever.  I mean, for the whole period.  I'm

17  talking about for the period '86 to 2007.

18          MR. HARWOOD:  Objection.

19          BY MR. CHARLTON:

20  Q.  If you know.  I mean, if you don't know, you

21  don't know.

22  A.  I don't -- I only know as far back as the mid-

23  90s when I started receiving it.  I still received

24  veterans preference as one of the job elements that is

25  in my regular download from NFC.

26  Q.  But you don't capture it?

63

1      A.  Oh, yes, I did -- I started receiving it and

2  capturing it on a regular basis in the mid-90s.  This

3  is in 1990 itself.  This was before veterans preference

4  was captured.

5      Q.  Okay.  I understand.  Now, let's see if we can

6  put this so everybody else will understand in the

7  record.

8          Okay.  The first question is, for the whole

9  period of time of the existence of the Bob Mowbray

10  fields, was there -- was veterans and disabled veterans

11  information captured?

12      A.  Not for the entire time.

13      Q.  All right.  Did there come a time when this

14  started being captured?

15      A.  Yes.

16      Q.  And when was that?

17      A.  I can't say for sure.

18      Q.  Well, just the closest five years.

19      A.  Well, somewhere --

20      Q.  We'll figure it out later.

21      A.  -- in the mid-90s.

22      Q.  All right.  So if you looked at your 76 pages

23  here and you got to the right field in the mid-90s

24  somewhere you would start to find it; right?

25      A.  Correct.

26      Q.  Okay.  Now, hold it while I make a note of

64

1    that.

2                MR. HARWOOD:  Walter, I see here where you

3    have not yet marked these couple pages.

4                MR. CHARLTON:  Yes, well, we better do that.

5    Where are they?  All right.  Let's mark those four

6    pages as -- what is the next exhibit?

7                MR. HARWOOD:  Why don't we make a copy of

8    these so we have a full set of the exhibits and then

9    we'll make this Exhibit 5.

10               MR. CHARLTON:  You just confused me with your

11   statement.

12                                  [Mowbray Deposition

13                                  Exhibit No. 5 was marked

14                                  for identification and

15                                  made a part of the

16                                  record.]

17               BY MR. CHARLTON:

18        Q.  All right.  Now, for the year we are talking

19   about, I would like you to -- if you are able to, go

20   through each one of the four sets of -- four groupings

21   of files and take them in any sequence you want and

22   take each one of the fields and tell me if you can

23   identify them or not, and if you can identify them what

24   they are.

25        A.  Okay.

26        Q.  Out of the top of your head.  If you can't,

1    just say, "I can't identify them."

2         A.  All right.

3         Q.  First tell us what page you're on?

4         A.  All right.  I'm on page 3.  I'll put them in

5    order.

6         Q.  First of all let me identify the document.  We

7    are talking about Exhibit 5, pages -- what are the page

8    numbers?  3 is the first one, the lowest number.  Put

9    them in number sequence first of all.

10        A.  All right.

11        Q.  We put the sticker on the wrong page, but

12   okay.  But in describing them we'll put them in number

13   sequence.  So we're talking about page 3, what is that

14   16 --

15        A.  Correct.

16        Q.  -- 40 and 60?

17        A.  Uh-huh.

18        Q.  All right.  Now we're talking about page 3 of

19   Exhibit 5.  And tell us the names of the fields and

20   what they mean.

21        A.  The first one "_FREQ_" which has an underline

22   in the front and an underline in the back looks like

23   the output from a SAS PROFREQ and it really probably

24   has no meaning in here.  It just means that at some

25   point in creating it, I ran a frequency distribution

26   and read it out.  And the same is true of the second

1    one "_TYPE_" which has an underscore in the front and
2    an underscore in the back.  We look in the file and we
3    find nothing of use in those fields.
4            "ANNBAND" is the announcement band.  That is,
5    whether it's saying for instance, band 2, band 3.
6            "ANNOUNCE" would be the announcement number,
7    specific announcement number.  It also has "ANNUM"
8    which is a variable I also used for announcement
9    number.  How those two compare to each, I don't know.
10   I would have to look.
11           "ANNUNIT" is the announcing unit.
12           "ANSERIES" is the announcement series.
13           "AVG" is the average which would, I think,
14   represent the panel score, the average score from the
15   panel.
16           "BAND", I think, is the employee's band since
17   "ANNBAND" would have been the announcement band.
18           "BQCUT" would be the cut score for
19   determining BQ or Q.
20           "DOB" date of birth.
21           "DUPE" I'm not sure what that means.  It
22   probably means a duplicate of some kind, but I'm not
23   sure why or what it's for.  If I looked at it, I could.
24           "EDUCLVL" educational level we talked about
25   is the educational level.
26           "EXT" I can only guess at this point might

1    mean it's an external applicant.  Because I don't see

2    APPLSTAT which is a variable I use in other ones which

3    is the internal or external.

4          Next is federal service comp date which is

5    the date of the federal hire.

6          "FNAME" first name.

7          GAO service comp date is self explanatory.

8          "GENDER" is self explanatory.

9          "HCCODE" is the two-digit disability code.

10         "LNAME" is last name.

11         "NEWPROM" would be the date of last

12   promotion.

13         "PANEL" would be panel name.

14         "RACE" would be, of course, race.

15         "RATING" has a value of either BQ or Q.

16         "REG" no idea.

17         "SALARY" is salary, of course.

18         "SELECT" is whether the person was selected.

19         "SERIES" is the person's job series.

20         "SSN" is, of course, Social Security Number.

21         "STAT" don't know.

22         "UNIT" would be the employee's unit.

23         That's the first one.

24     Q.  That's the first page.  Okay.  Go to the next

25   page which is page number what?

26     A.  Page number 16.

68

1      Q.   Okay.  PFP Data.

2           Now, "ACSCORE" let me think a minute, in 1990

3    the appraisals and -- oh, there was an appraisal and a

4    contribution component in pay for performance in 1990.

5    That's 18 years ago, that's a lot of remembering here.

6           "ACSCORE" is, I'm not sure.

7           "ARANK" would be the appraisal rank.

8           "ASCORE" would be the appraisal score.

9           "AUTOLOAD" don't know, something that just

10   came in from the software.

11          "BAND" would be the employee's band.

12          "BGROUP" don't know.

13          "BONCAT" appears to be some kind of a bonus

14   category.  But there's also a "BONCATS" and I'm not

15   sure which of those two is most meaningful.  I would

16   have to look at the data.

17          "BONUS" is the actual bonus amount.

18          "CRANK" would be contributions rank.

19          "DOB" is date of birth.

20          "EDUCLVL" educational level, same as before.

21          Eligible "ELIG" probably means eligible for

22   assessment for PFP.

23          "EMPLTYPE" is is employee type.  For instance

24   A is a full-time permanent and so forth.

25          "EMPSALRY" must be the employee's salary.

26          "FEDSCD" federal service comp date we know.

1            "FNAME" first name.

2            "GAOSCD" GAO service comp date is GAO hire

3    date.

4            "GENDER" is, of course, self explanatory.

5            "GRADE" is the employee's grade.

6            "GROUP", I'm not sure what that means in this

7    year.

8            "HCCODE" is the disability code.

9            "JUL90SAL" is the July '90 salary of this

10   person.

11           "LASTPROM" is the last date of the last

12   promotion.

13           "LASTWGI" is the date of the last within

14   grade increase.

15           Last name is "LNAME".

16           "METHOD" I'm not sure of that.

17           "MNAME" is middle name.

18           "NEWBAND" I'm not sure why there is a new

19   band in there.

20           "NEWPROM" again is the date of last

21   promotion.

22           "OCTBAND" would be the October band.

23           "OCTGRADE" would be the October grade.

24           "OCTLSTPR" probably means something like

25   October last promotion.

26           "OCTSALRY" would be October salary.

1          "ORGCODE" seven-digit org code tells where

2    the person is assigned.

3          "PANEL" would be the panel name.

4          "PAYCAT" whatever pay category a person was

5    placed in.

6          "PAYPLAN" is probably PE because these people

7    were all pay plan PE, their pay for performance.

8          "PNLID" is a panel ID.

9          "PPSAL" is pay protection salary.  There was

10   pay protection in those days.

11         "PROFCAT" is a professional category which

12   is, for instance, 1 for SES, 2 for analyst and related.

13   I think all these people had the same PROFCAT.

14         "PROM89" is the -- I'm not sure.  It's either

15   -- I don't think it's the grade in '89.  It might be

16   what their last promotion date was when they were

17   converted in '89.  I'm not sure of that.

18         "PSALAMT" I know is the final salary that

19   came out of the process.

20         "RACE" of course is race.

21         "RANGE" I'm not sure.

22         "RANK" probably their overall rank.

23         "REWARD" not sure what reward meant that

24   year.  Have to look at the book.

25         "SALINC" Salary increase, the total amount

26   that the person's salary increased.

1          "SALSFLAG" is salary set flag.  The method by

2    which the salary was increased.

3          "SEPACCTP" I think is some code that

4    identifies people who are either recently hired into

5    the system or being processed out of the system.

6          "SERIES" is, of course, the person's job

7    series.

8          "SSN" is SSN.

9          "STEP" is the person's step.

10          "TCSCORE" would be total contribution score.

11          "TDAYS" I don't know.  Total days, but I

12    don't know what total days represents.

13          "TIE" might be a flag in case people are

14    tied.

15          "TITLE" is the person's job title.

16          "TSCORE" is the total score.

17          "TYPEEMPL" is something like empl type, but I

18    don't know what it means.

19          And "UNIT" is the employee's unit.

20          And that completes page 16.

21    Q.  Okay.  Go to the next page.

22    A.  The next page is the Appraisal Data, page 40.

23          All right.  First we have "ASCORE" and,

24    again, I'm not sure what that means.

25          "AVGBARS" average bars.  That would be the

26    average of the ratings on the bars dimensions.

1           "BDATE" is the beginning date of the
2    appraisal.

3           "DAYS" would represent the days that the
4    appraisal covered.

5           That must be a typo there.  Let's see, I have
6    "DDIM5" which probably means nothing because I have
7    "DIM1, DIM2, DIM3, DIM4, DIM5, DIM6, DIM7, DIM8," all
8    the way up through "DIM12" are the actual rating scores
9    on each of the 12 dimensions.

10          "EDATE" is the ending date.

11          "FNAME" first name.

12          "LNAME" is last name.

13          "ORGCODE" is the seven-digit org code.

14          "PANEL" is -- I'm not sure what panel is in
15    that.

16          It has "RSSN" which would be the, I guess,
17    the rater's SSN.

18          And then "SSN" which is the person's SSN.

19          That completes page 40.

20          Now, to page 60 which is NFC data from
21    October of 1990.

22          We have "BAND" which is the employee's band.

23          "DOB" is date of birth.

24          Educational Level "EDUCLVL" we've mentioned
25    before.

26          "EMPLTYPE" we've mentioned before.

1            Federal Service comp date we've mentioned

2    before.

3            First name as before.

4            GAO service comp date as before.

5            "GENDER" as before.

6            "GRADE" is, of course, the person's grade.

7            "GRADE89" is probably the grade the person

8    was before they were converted to bands.

9            "HCCODE" is disability code as before.

10           "LASTPROM" is the date of last promotion.

11           "LASTWGI" date of last within grade increase.

12           "LNAME" is last name.

13           "MNAME" is middle name.

14           "NEWPROM" date of last promotion.

15           "ORGCODE" seven-digit org code.

16           "PAYPLAN" is PE for all these people.  Oh,

17   no, maybe not.  Payplan tells what pay plan a person is

18   in.  It could be GS.

19           "PROFCAT" is the professional category.

20           "PROM89" again we're not exactly sure.  If I

21   looked at it, I could tell.  It has something to do

22   with what their promotion date is at the time of

23   conversion.

24           "RACE" is race.

25           "SALARY" salary.

26           "SEPACCTP" is an indicator of whether the

74

1    person is just leaving the organization or just

2    gaining.

3              "SERIES" job series.

4              "SSN" is the person's SSN.

5              "STEP" their step.

6              "STEP89" their step at conversion.

7              "TITLE" job title.

8              Once again, "TYPEEMPL" I'm not sure how that

9    differs from "EMPLTYPE" but it's there.

10             And "UNIT" is the person's unit.

11    Q.   Okay.  Give me a minute I'm reviewing some

12    questions here.

13             [Pause.]

14             BY MR. CHARLTON:

15    Q.   Does GAO have any plans now to upgrade or

16    modernize the system?

17    A.   There is no system.  I just collect --

18             MR. HARWOOD:  Objection.

19             BY MR. CHARLTON:

20    Q.   Modernize the --

21             [Simultaneous conversation.]

22             BY MR. CHARLTON:

23    Q.   Well, collect the data and turn it into an

24    off-the-shelf type database system?

25    A.   I don't know of any.

26    Q.   You don't know of any.  Okay.

75

1            MR. CHARLTON:  All right.  I think we're

2    making quite good progress here.  But I want to take a

3    short break, if we can.  And I would prefer to go

4    through and not have lunch and get out of here.

5            MR. HARWOOD:  Okay by me.

6            MR. CHARLTON:  But I do need a break right

7    now.  So let's take a ten-minute or so --

8            MR. HARWOOD:  How far do you think you're

9    going to go?

10           MR. CHARLTON:  I don't know.

11           [Brief recess taken at 12:12 p.m.]

12           [Record resumes at 12:30 p.m.]

13           MR. CHARLTON:  Okay.  Thank you.  Are we back

14   on the record?

15           BY MR. CHARLTON:

16       Q.  All right.  Thank you, Mr. Mowbray.  That was

17   difficult, but more difficult for you than us, I guess.

18           All right.  Now, I have a couple of general

19   questions I want to ask about your workload and stuff.

20   When you work -- I mean, I presume you work hard and

21   you have demands on your time.  Who asks you to do

22   jobs?

23       A.  Any number of people.  The Human Capital

24   Office might ask.  My supervisor might ask.

25       Q.  How about the legal division?

26       A.  They might ask.

76

```
 1        Q.  Anyone else?

 2        A.  It could be --

 3        Q.  The Comptroller General?

 4        A.  No.  We don't even have a Comptroller General.

 5        Q.  I mean before.  I'm talking 20 years here.

 6        A.  No.

 7        Q.  Huh?

 8        A.  No.

 9        Q.  Never been asked by the Comptroller General to

10   do anything?

11        A.  Not specifically that I can recall.

12        Q.  How about SallyAnne Harper?

13        A.  She could have, but I don't -- a request that

14   she was going to ask would probably come through Cher.

15        Q.  From who?

16        A.  Cher Whitaker.  Cheryl Whitaker.

17        Q.  Whitaker.  Who was your direct supervisor?

18        A.  Exactly.

19        Q.  So whoever wanted it.  All right.  Have you

20   ever made or processed a request from a promotion

21   panel?

22        A.  From a promotion panel.  No.

23        Q.  Not ever?  How about the Kansas City promotion

24   panel?

25        A.  That wasn't a promotion panel

26        Q.  Oh, well, okay.  So you're being specific.  I
```

1    don't know a promotion panel from a big red dog in

2    terms of definitions.  When somebody is rating people

3    for performance appraisals and when they were closing

4    the Kansas City Office and all of that stuff, where who

5    is doing their job right is important, what do you call

6    it, those kind of panels and organizations?

7            MR. HARWOOD:  I'm going to object.  I don't

8    understand the question.  But if you do, you --

9            THE WITNESS:  No, I don't.

10           BY MR. CHARLTON:

11      Q.   Okay.

12           MR. HARWOOD:  And does the question have to

13   do with this litigation?

14           MR. CHARLTON:  Yes.  Let me rephrase.  Strike

15   all that and we'll rephrase.

16           BY MR. CHARLTON:

17      Q.   Do you get requests that are used by people

18   determining promotions and ratings?

19           MR. HARWOOD: Objection.

20           BY MR. CHARLTON:

21      Q.   At GAO?

22           MR. HARWOOD:  Objection; to the extent you

23   know.

24           THE WITNESS:  I don't understand the

25   question.  Could you run that by again?

26           BY MR. CHARLTON:

1          Q.  I'll try.  Your reports contain a lot of

2     information regarding a person's performance and work

3     history; do they not?

4          A.  Past performance, yes.

5          Q.  Past performance.  Who is -- what is the

6     function of a typical user of your data fields?

7               MR. HARWOOD:  Objection.

8               BY MR. CHARLTON:

9          Q.  Or the data information.  Your reports, your

10    printout reports.

11              MR. HARWOOD:  Objection to "typical".

12              THE WITNESS:  Yeah, what's "typical"?

13              BY MR. CHARLTON:

14         Q.  It means from day-to-day who is using this

15    stuff you crank out?

16              MR. HARWOOD:  Objection.  To the extent you

17    know.

18              BY MR. CHARLTON:

19         Q.  If you know.

20         A.  Human Capital Office might want to know --

21    might need data for process of retention allowance.

22    Somebody may be eligible for a retention allowance or

23    their supervisor has applied for one.  They --

24         Q.  What is a "retention allowance"?

25         A.  A retention allowance is pay above and beyond

26    your normal pay from someone who has received an offer

79

1    or whoever they think is likely to leave the agency.

2    And, of course, they would want to know the performance

3    of those people.  And so the Human Capital Office would

4    ask me for information on that individual and I would

5    use the files that I have to give them PFP information

6    and performance information and ratings information on

7    those people from those history files.

8         Q.  Have you ever had a request from the General

9    Accounting Office or Government Accountability Office,

10   Personnel Appeals Board for information?

11        A.  I'm sure years ago there have been some.

12        Q.  Do you recall a specific event?

13             MR. HARWOOD:  Objection.

14             THE WITNESS:  For information or for --

15             BY MR. CHARLTON:

16        Q.  A request for information from your files by

17   anyone at the Personnel Appeal Board?

18        A.  Actually that may not --the way you just

19   characterized it strikes me a little differently.  I

20   have been asked to provide information for the

21   Personnel Appeals Board, but I don't get the request

22   from the Personnel Appeals Board.

23        Q.  Who do you get it from?

24        A.  I get it through legal services, through the

25   General Counsel's office.

26        Q.  So you -- okay.  To put it differently,

80

1    there's no direct contact with you, it all gets -- it

2    comes in through your supervisors and other folks.  The

3    Personnel Appals Board would not contact you directly?

4        A.  Correct.

5        Q.  Okay.  Do you have any knowledge as to whether

6    the Personnel Appeals Board even knows of your

7    existence or not?

8            MR. HARWOOD:  Objection.

9            THE WITNESS:  I have no way --

10            MR. HARWOOD:  Before you answer -- before you

11    answer.  Objection.  But I also want to note that you

12    are not to testify to anything -- any communications

13    that you have had with the Office of General Counsel,

14    things that you've learned from lawyers in this case,

15    that's privileged.

16            MR. CHARLTON:  That's I don't think accurate.

17    I don't think it's privileged.  But you're not

18    representing him as an individual here.

19            MR. HARWOOD:  I'm representing him as an

20    employee of that GAO.

21            MR. CHARLTON:  All right.  But whether his

22    conversation is privileged or not is a who different

23    matter.

24            MR. HARWOOD:  Well, I 'm instructing you, if

25    you are being asked to testify about anything that you

26    learned from counsel, then you are to discuss with me

1    so we can determine whether the communication is

2    privileged or not.  It may or may not be.  But --

3             MR. CHARLTON:  That I do not object to.

4             MR. HARWOOD:  Okay.

5             BY MR. CHARLTON:

6        Q.  Okay.  Now, back to the question.  Have you

7    ever received a request for information where yo know

8    that the destination of it was the Personnel Appeals

9    Board?  That is, the output from your data files.

10       A.  I received requests that I was told that it

11   was data for the PAB; yes.

12       Q.  And what was the nature of those requests?

13       A.  Well, in some cases it may be as simple as

14   tell me all the people who were in a given unit in a

15   given year or in several given years.

16            In other cases it may be, tell me -- tell me

17   with regard to a specific individual all of the ratings

18   of the people who were in the same pay plan and band

19   and unit as that person.  Things could vary.

20            MR. HARWOOD:  It sounds like you are

21   hypothesizing.  Could Walter agree that we want you to

22   testify as to what you remember.

23            MR. CHARLTON:  Is that an objection?

24            MR. HARWOOD:  That's not an objection.

25            MR. CHARLTON:  I just don't want any comments

26   to influence the witness on this point, please.  If

82

1    you're going to make an objection, make an objection.

2              BY MR. CHARLTON:

3        Q.  All right.  So is it fair to say that -- okay,

4    over what period of time have such requests occurred as

5    you just described; requests where the data was

6    ultimately destined to go to the PAB?

7              MR. HARWOOD:  Objection.

8              BY MR. CHARLTON:

9        Q.  Are we talking recently?  Are we talking the

10   whole time frame from '86 on, or are what?

11       A.  I couldn't characterize it as either as simply

12   recently or as the entire period.  Just some time in

13   the past.

14       Q.  It has happened?  You're saying it has

15   happened?

16       A.  [Nods affirmatively.]

17       Q.  So is it fair to say that you know -- is it

18   fair to say of your own knowledge that the PAB knows of

19   the existence of Bob Mowbray's data files?

20             MR. HARWOOD:  Objection.

21             THE WITNESS: I don't know.  I don't know what

22   they know, that they know what they know.

23             BY MR. CHARLTON:

24       Q.  Well, if you've given them information and

25   they know where they got it from, don't they?

26       A.  No.

1           MR. HARWOOD:  Objection.

2           THE WITNESS:  If I give information to legal

3    services and they give information to PAB, the PAB

4    doesn't know where legal services got it.

5           BY MR. CHARLTON:

6      Q.  I see.  So you -- All right.  Have you or have

7    you not had direct contact with any PAB employee,

8    officer or judge?

9           MR. HARWOOD:  Objection, as to what the

10   contact was for.

11          MR. CHARLTON:  Pardon?

12          MR. HARWOOD:  You asked him if he had any

13   contact at all.  You didn't specify with respect to

14   what.

15          MR. CHARLTON:  That's what I mean, any

16   contact at all, personnel, email, letter, or otherwise.

17          MR. HARWOOD:  Objection.  You can answer.

18          THE WITNESS:  Okay.  Can we talk?

19          MR. HARWOOD:  Is it a privilege issue?

20          THE WITNESS:  No.

21          MR. HARWOOD:  Then you have to answer the

22   question.  If it doesn't raise a matter of privilege

23   then you have to answer the question.

24          THE WITNESS:  The only contact that I can

25   recall is a deposition with PAB.

26          BY MR. CHARLTON:

84

1        Q.  Your deposition was taken?

2        A.  Yes.

3        Q.  By who and when?

4        A.  By Anne Wagner.  And I don't recall when.  It

5   was within the past two years, but I don't know when.

6        Q.  Was it in conjunction with the Band II split?

7        A.  I don't know that that was the topic.  I don't

8   really recall.  Yeah, I know it had to do with SRS.

9        Q.  What is "SRS"?

10       A.  Standard rating score used in performance-

11  based compensation which is now which is what the PFP

12  evolved into.  PFP is performance -- pay for

13  performance evolved into performance-based

14  compensation.

15       Q.  And is that concept or the numbers, recording

16  that score is that part of your data fields?

17       A.  It's part of the data field since the 2004 PFP

18  cycle or PPC cycle.

19       Q.  But not before?

20       A.  Correct.

21       Q.  Is that the only instance you can think of?

22       A.  Yes.

23       Q.  Was that a deposition in a PAB case?

24       A.  I can't even remember.  I honestly don't know.

25       Q.  Okay.  Well, we can get that, that's not a

26  problem.  Okay.

85

1           All right.  How many runs or reports do you

2    run in a typical month?

3        A.  I don't think there is a typical month.

4        Q.  What do you -- you mean each month is entirely

5    different?  You don't have a routine?

6        A.  The things I do range from very small to very

7    large.  They are not counted.  I don't log them.  I

8    couldn't say.

9        Q.  Is there any record of who you distribute you

10   reports to?

11       A.  No.

12       Q.  So a report is printed from a computer where,

13   in Austin?

14       A.  No, right outside my office.

15       Q.  So they fire it over the wire from Austin to

16   you --

17       A.  Right.

18       Q.  -- and it's printed out and you hand it out to

19   somebody?

20       A.  Correct.

21       Q.  And there is no record made of who you hand it

22   to?

23       A.  No.  There's no log or record.

24       Q.  Do they keep a log of what they do in Austin?

25       A.  No, those computer logs are deleted weekly.

26       Q.  Are the -- is there any security designation

86

1    on these?  Are these secret files or anything like

2    that?

3         A.  No.

4         Q.  Why is there no record kept of what you do?

5              MR. HARWOOD:  Objection.

6              BY MR. CHARLTON:

7         Q.  If you know.

8         A.  I don't.

9         Q.  You don't know why there's no record?

10             MR. HARWOOD:  Objection.

11             BY MR. CHARLTON:

12        Q.  Or you just were never asked to keep one or

13   what?

14        A.  Well, certainly I was never asked to keep one,

15   that's for certain.

16        Q.  Or you would be doing it.

17             MR. HARWOOD:  Objection.

18             BY MR. CHARLTON:

19        Q.  Do you know who Ron Stroman is?

20        A.  Yes.

21        Q.  Have you ever furnished reports to Ron

22   Stroman?

23        A.  Yes, I've given data to him.

24        Q.  Day-to-day?

25        A.  No, data.

26        Q.  You've furnished him data?

87

1     A.   Yes.

2     Q.   How frequent is your contact with him?

3     A.   Very infrequent.

4     Q.   And before in the Office of Civil Rights did

5    you ever furnish them information?

6     A.   Yes, occasionally.

7     Q.   Okay.  Now, in your prior testimony I asked

8    you a question about if you received a request from the

9    Comptroller General to prepare a report for him with 20

10    variables in it and approximately how long would it

11    take you.  And as I recall your answer, it was, I can

12    usually turn everything around within two days; is that

13    still accurate or have I got that straight and I would

14    like you to comment on that.

15          MR. HARWOOD:  Objection.  Do you want him to

16    review his testimony?

17          MR. CHARLTON:  No, I just want to ask him a

18    new question on that subject.

19          THE WITNESS:  Okay.  What's the question?

20          BY MR. CHARLTON:

21    Q.   If I was the Comptroller General and I said, I

22    want you to prepare me a report combining all four of

23    these files for five years, and analyze 20 variables in

24    the following format, about how long would it take you

25    to do it?

26          MR. HARWOOD:  Objection.

88

1           THE WITNESS:  There would be no way to answer

2     that question.  There's no way to tell how much

3     complexity is involved once you start merging data.

4     Some files have multiple records per Social Security

5     Number, files don't, some files don't.  And we haven't

6     even talked about what the complexity is of the

7     analysis that you want done.

8           BY MR. CHARLTON:

9     Q.  So it would depend on the complexity of the

10    job entirely?

11          MR. HARWOOD:  Objection.

12          THE WITNESS:  In part.  Also on the

13    complexity are the data sets involved and whether there

14    are any mismatches in merging.  Just because they both

15    contain SSN doesn't mean that they merge up completely.

16    There will be some SSNs in one that don't exist in the

17    other, vice versa, and potential multiple occurrences

18    of SSNs and it can get very complicated.

19          To do a thorough job it takes time.

20          BY MR. CHARLTON:

21    Q.  And here, as I understand your prior

22    testimony, some of the -- I mean, the files aren't even

23    in the same format from year to year; correct?

24    A.  Correct.

25    Q.  So you would have that complexity also.

26          Okay.  Can your files be combined, combining

89

1    all the variables for all persons into a --

2              Let me rephrase that.

3              If you were asked to combine four sets of

4    files, four groups of files that you call them, into

5    one master file for the people for one year, would you

6    be able to do that?

7         A.  I don't know that it would be -- I'm trying to

8    picture how I would do that.  Because you're talking

9    about one file.  Some of these files, like the NFC data

10   files, the staffing files, have literally one record

11   per individual, one record per individual.  The pay for

12   performance or PPC files have one record per

13   individual.  But promotion files have some individuals

14   may apply eight, nine times.  So there are eight or

15   nine records per individual in those.

16             So the question would become, how would you

17   combine them into a file.  Do you count to still have

18   one record per individual or do you have nine times as

19   many records because they were, when you merged in the

20   data from the MSP you had nine.  It's better to do

21   analysis by doing the individual analyses drawing from

22   the individual data sets rather than attempting to

23   combine them all into one very, very large file unless

24   we were willing to spend a lot of money and have

25   professional developers do it.

26        Q.  Okay.  Now, next question.  Are you able to --

90

1    would you be able to analyze and extract data from each

2    one of the files and merge it into a predetermined

3    format master file, one such for each person for each

4    year?

5            MR. HARWOOD:  Objection.

6            BY MR. CHARLTON:

7        Q.  In a fixed format.  Let's assume it's a fixed

8    format.

9        A.  That, again, I think would be a very difficult

10   way to do it because we're talking here about merging

11   four files that have to be merged by SSN.  The question

12   becomes, what happens when I have one person here from

13   the NFC data, I could merge that person's PFP data in

14   because there was only one record in the PFP file.  But

15   when I try to merge by Social Security Number the

16   promotion data there may be seven records for that

17   person.  When I do the merge I now have seven records

18   for that person, not one.  So it would be very

19   difficult to do in fixed file format.

20       Q.  All right.  Is there any other way to do it?

21   What would you suggest --

22           MR. HARWOOD:  Objection.

23           BY MR. CHARLTON:

24       Q.  -- as an alternative to get -- say that was a

25   requirement, how would you go about doing it?

26           MR. HARWOOD:  Objection.

1          THE WITNESS:  I would talk someone out of

2     that requirement is what I would do.  Because it would

3     be better to do analyses of pay for performance from

4     the pay for performance database; to do analyses of

5     promotions from the promotion database and so forth.

6     And if pieces of data were needed from other files,

7     simply bring them in, in the course of the analysis.

8     But to attempt to make them into one big megafile would

9     be very, very difficult.  It would be a lot of details.

10          BY MR. CHARLTON:

11     Q.  But with the information all there, then the

12     methodology you just talked about could accomplish

13     perhaps the result you are looking for.

14          MR. HARWOOD:  Objection.

15          THE WITNESS:  What result is that?

16          BY MR. CHARLTON:

17     Q.  Well, a result of cross comparing and linking

18     data from your four groups of data.

19          MR. HARWOOD:  Objection.

20          THE WITNESS:  That can now be done in the

21     course of an analysis; yes.

22          BY MR. CHARLTON:

23     Q.  And you do that -- and you do that all the

24     time; do you not in these reports you run for various

25     folks?

26          MR. HARWOOD:  Objection.

92

1           THE WITNESS:  No, I do it sometimes.

2           BY MR. CHARLTON:

3      Q.  Sometimes.  Well, okay.  So you do it.

4      A.  It can be done.

5      Q.  Okay.  All right.  And if you had to do a job

6  like that for a particular year, how long would it

7  take?  Is that a difficult job?

8           MR. HARWOOD:  Can you just define the "job

9  like that"?

10          MR. CHARLTON:  Like that is what he just said

11 in his words.  I don't want to recast them.

12          THE WITNESS:  I didn't define any level of

13 complexity or magnitude of job in what I was talking

14 about.

15          MR. HARWOOD:  The conversation was very

16 general, I think you need to be more specific.

17          BY MR. CHARLTON:

18     Q.  Okay.  Well, let's go to something else.  If I

19 wanted to compare promotion or not by age and race and

20 grade, band, et cetera, can you generate such a report?

21          MR. HARWOOD:  Objection to "et cetera".

22          MR. CHARLTON:  Well, strike, "et cetera".

23          MR. HARWOOD:  Do you have the question?

24          THE WITNESS:  Yes, the question is, can I

25 generate for, I suppose, a given year, a report

26 summarizing promotions by age or gender or band; was

1   that it?

2          BY MR. CHARLTON:

3      Q.  Yes.  Age, race, gender, band.

4      A.  Yes.  Because those variables all exist in the

5   MSP databases.  By the way, I can do that only through

6   the year 2001.

7      Q.  Only through 2001.  Why is that?

8      A.  The collection of data for the promotion cycle

9   was moved to the human capital office starting in 2002

10  and they have retained the data, but not in SAS format

11  and not in any format I can access since then.  It's in

12  Excel spreadsheets.

13     Q.  So they have a system.  Okay.

14     A.  They have spreadsheets.

15     Q.  They have spreadsheets.  Okay.

16          Can your files be analyzed by band, age

17  range, race of the person promoted by year, band and

18  grade?

19     A.  Is that what you just asked?

20     Q.  No.

21     A.  Promotion you just asked, didn't you?

22     Q.  I put in age range in this one.

23          MR. HARWOOD:  Why don't you just reask the

24  question.

25          BY MR. CHARLTON:

26     Q.  Can your files be analyzed by band, the age

94

1    range and race of the person promoted by year band and

2    grade?

3         A.  By year, band, and grade; yes.

4         Q.  Can your files for each year compare the

5    performance rating and promotions by age, race, year,

6    and grade, and band?

7              MR. HARWOOD:  Objection to "for each year."

8              THE WITNESS:  The answer is, yes, but the

9    farther back we go the worse the rating data is.  The

10   rating data is not always complete as we get farther

11   back and we go back into the '90s.  And when we attempt

12   to bring in rating data we are not always guaranteed.

13   Remember rating data does not exist in the promotion

14   data files in the MSP files.  The rating data is in the

15   appraisal file.  So we would have to merge in three

16   years of rating data because the MSP folders contain

17   the last three years ratings.  We would have to bring

18   in three years of ratings for each applicant.  And it's

19   not guaranteed that all the data is going to be there

20   for all of those -- for all of those applicants.

21             BY MR. CHARLTON:

22        Q.  I understand.

23        A.  I did the best I could in putting together the

24   rating file.

25        Q.  So you've got data problems with that --

26        A.  Perhaps.

1      Q.  -- for that particular calculation.  Okay.

2           You mentioned in your -- when you were going

3  through the sheets you said in conjunction with page

4  16, "I have to look at the book" because you couldn't,

5  what does that -- what book?

6      A.  It's the -- each year in pay for performance

7  GAO issues what they call the PFP handbook and it's

8  issued and it's available to all the staff.  And it

9  merely lays out the parameters for the process that

10 year including things like what are the bonus

11 categories, or how much -- what percent of people are

12 allowed to be put into a certain category.  And it's

13 publicly available.  I have copies of almost all, if

14 not all of them historically.

15          MR. CHARLTON:  All right.  Just a moment I

16 may be done.

17          [Discussion held off the record.]

18          BY MR. CHARLTON:

19     Q.  Do you have a list of computer programs or do

20 you have a book of computer programs?  I mean, how do

21 you store your programs?

22     A.  They're stored at the mainframe down there.

23     Q.  So they're in Austin?

24     A.  They're in Austin.

25     Q.  And are they written by the folks in Austin?

26     A.  No, they're written by me.

96

1      Q.  They're written by you.  You don't keep copies

2   of them?

3      A.  Do you mean paper copies?

4      Q.  Any kind of copies.

5      A.  No, I don't keep paper copies, no.

6      Q.  But you have each one of your programs on your

7   computer, I presume?

8      A.  Each of the recent ones, yes.

9      Q.  Yeah, okay.

10         MR. HARWOOD:  These are the SAS programs

11   you're talking about?

12         THE WITNESS:  Correct.  The SAS programs.

13         MR. CHARLTON:  Okay.  That's all I've got.

14         MR. HARWOOD:  I don't have anything.

15         [Whereupon, at 1:02 p.m., the deposition of

16   William R. Mowbray was concluded.]

CERTIFICATE OF REPORTER

I, Cynthia D. Thomas, a Notary Reporter, in and for the District of Columbia, do hereby certify that the foregoing proceeding was transcribed by me and is a true and accurate record of the testimony given to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the action in which this proceeding was taken; and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto, nor financially or otherwise interested in the outcome of this action.


_____
Cynthia D. Thomas, CVR
Court Reporter

Notary for the District of Columbia
My Commission expires:  December 14, 2009

ACKNOWLEDGEMENT OF DEPONENT


_____ )
VENKAREDDY CHENNAREDDY, et al.,          )
                                         )
                Plaintiff,               )   CA: 87-3538 (EGS)
                                         )
        vs.                              )
                                         )
DAVID M. WALKER,                         )
                                         )
                Defendant.               )
_____ )


        I, William R. Mowbray, hereby acknowledge

that I have read and examined pages 1 through 113,

inclusive, of the transcript of my deposition, and that

except for the changes noted in the attached Errata

Sheet, the same is an accurate and complete

transcription of the answers given by me to the

questions therein recorded.


_____    _____

    Date                                  Signature

    Subscribed and sworn to before me this _____

day of _____, _____.


                    _____

                        Notary Public

My commission expires:

99

**E-R-R-A-T-A    S-H-E-E-T**

In re:  Venkareddy Chennareddy vs. David M. Walker

Deposition of:  William R. Mowbray

Taken on:  Friday, May 16, 2008

     At the time the above-named deponent read and
signed the deposition, the deponent desired to make the
following corrections:

PAGE:   LINE:    AS TRANSCRIBED:        CHANGE TO:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


DATED: _____SIGNED:_____